**Carolyn ALLEN, Plaintiff,**

v.

**UNUM LIFE INSURANCE CO. OF AMERICA, Defendant.**

**No. 1:02 CV 00097.**

United States District Court, W.D. Virginia, Abingdon Division.

March 31, 2003.

John M. Lamie, Mary C. Hendricks, Browning, Lamie and Gifford, Abingdon, VA, for Plaintiff.

David E. Constine, III, Richard F. Hawkins, III, Mays & Valentine, Troutman Sanders LLP, Richmond, VA, for Defendant.

## OPINION

JONES, District Judge.

In this ERISA case, in which the plaintiff seeks long-term disability benefits, I find after a careful review of the record of the plan administrator's denial of benefits that summary judgment should be entered for the defendant.

### I

The plaintiff, Carolyn Allen, received her degree in nursing from Southwest Virginia Community College in 1991 (R. at 663 [1]) and was employed as a registered nurse at the Buchanan General Hospital, Inc. ("Hospital") from 1992 to 1998. (R. at 661.) On September 17, 1998, she filed a claim for long-term disability benefits pursuant to an employee benefit plan established by the Hospital (the "Plan") and administered by Unum Life Insurance Company of America ("Unum"), the defendant in this case.

Under the Plan, an eligible Hospital employee is deemed disabled and eligible for benefits for the first twenty-four months when "Unum determines that you are limited from performing the material and substantial duties of your regular occupation due to ... sickness or injury; and you have 20% or more loss in your indexed monthly earnings due to the same sickness or injury." (R. at 126.) Following this twenty-four month period, a claimant is eligible for benefits only if she can demonstrate that she is "unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by education, training, or experience." (R. at 126.)

Allen's claim for benefits was based on her complaints of back pain attributed to an accident that occurred while she was employed at the Hospital. Upon consideration of the submitted documents, Unum determined that Allen was disabled and could not perform her regular occupation. However, once the first twenty-four month period in which benefits were paid had passed, Unum determined that Allen was able to perform other gainful occupations in keeping with her education, training, and physical abilities. Therefore, Unum ended the payment of benefits.

Allen filed this action on June 4, 2002, seeking a judgment requiring the defendant to pay long-term disability benefits to her under the Plan. Allen's cause of action arises under the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C.A. §§ 1001–1461 (West 1999 & Supp.2002) ("ERISA") and jurisdiction of this court exists pursuant to 29 U.S.C.A. § 1132(f) (West 1999). Both parties have filed motions for summary judgment, which have been briefed and argued. The case is now ripe for decision.

### II

The plaintiff claims that on March 28, 1998, she injured her back while aiding a 300–pound patient who had fallen. (R. at 610.) The plaintiff did not go to the emergency room nor was she seen by a doctor until March 30, 1998, when she was examined by D. Patel, M.D.[2] (*Id.*)

---

[1]. References are to the administrative record filed in the case.

[2]. The plaintiff was also treated or evaluated by Drs. J. Patel and M. Patel.

Dr. D. Patel observed "marked LS tenderness with muscle spasms; no neurological deficit, s1 and s2 normal" and did not see any dislocation or fracture after examining X rays of the plaintiff's lumbar spine. (R. at 610.) Dr. D. Patel diagnosed the plaintiff with an LS sprain, advised the plaintiff to rest, apply Biofreeze (a topical pain reliever), and take Tylenol. (*Id.*) The plaintiff again presented to Dr. D. Patel on April 3, 1998, with a backache and radiation of pain to the left leg. (R. at 611.) Based on her symptoms, Dr. D. Patel ordered the plaintiff to "stay off work," and prescribed her anti-inflammatory medication. (*Id.*) The plaintiff returned to Dr. D. Patel on April 8, 1998, continuing to complain of back pain and numbness in the right leg. (*Id.*) Dr. D. Patel ordered a CT scan, which showed a bulging disc at the L5–S1 region. (*Id.*) Dr. D. Patel directed the plaintiff to continue using muscle relaxants, told her to remain off work, and to start a two week program of physical therapy. (*Id.*) The plaintiff was examined by Dr. D. Patel again on April 23, 1998, for back pain and radiation of pain to the left leg. (R. at 612.) Because of her continuing complaints of pain, Dr. D. Patel referred the plaintiff to J. McConnell, M.D., an orthopaedic surgeon and spine specialist. (R. at 612.)

Dr. McConnell examined the plaintiff on May 13, 1998, and also examined her previously taken X rays and CT scan. (R. at 593.) Dr. McConnell noted that the plaintiff was a "healthy-appearing ... woman in no obvious discomfort ... [whose] lower back shows normal alignment." (R. at 592.) Additionally, Dr. McConnell found that her voluntary range of motion was limited and that she was "tender to palpation in the left sacroiliac joint area." (*Id.*) After examining her radiographic data, Dr. McConnell noted that the X rays of the plaintiff's spine showed no abnormalities and that the CT scan did not show any "obvious herniated disc." (*Id.*) He stated

that there "may be a small disc herniation on the left side at L5–S1." (*Id.*) Based on his findings, Dr. McConnell ordered an MRI scan to rule out radiculopathy secondary to a herniated disc. (*Id.*) Dr. McConnell advised the plaintiff to remain off work until further treatment recommendations could be made. (*Id.*)

The plaintiff returned to Dr. D. Patel on May 14, 1998, again complaining of back pain. Again, Dr. D. Patel advised the plaintiff to rest, apply heat, and stay off work for three weeks. (R. at 612.) Dr. D. Patel examined the plaintiff on May 26 and June 9, 1998, for back pain and pain in both legs. (R. at 613.) Dr. D. Patel directed the plaintiff to continue her application of Biofreeze and recommended that she take Motrin for pain. (*Id.*)

The plaintiff returned to Dr. McConnell on June 12, 1998, for a follow-up visit. According to his notes, the MRI scan showed "no evidence of disc herniation," but did show "multi-level degenerative discs in the lumbar region." (R. at 599.) Dr. McConnell advised the plaintiff to "begin an active physical therapy program ... [and] encouraged [her] to continue walking as much as possible." (*Id.*) Finally, Dr. McConnell noted that the plaintiff "might be able to return to work in four weeks." (*Id.*)

Dr. McConnell examined the plaintiff on August 3, 1998, and determined that an evaluation of the plaintiff's nerves in her right leg was completely normal and he recommended non-operative treatment. (*Id.*)

Dr. D. Patel continued to evaluate the plaintiff's continuing complaints of back and leg pain throughout 1998 and 1999. On June 22, 1998, Dr. D. Patel referred the plaintiff to Dr. J. Jayne, a neurosurgeon, for a second opinion regarding Dr. McConnell's findings. (R. at 614.) According to the treatment notes made by

Dr. D. Patel, the plaintiff was not actually examined until September 30, 1998, at which time a CT myelogram scan showed a bulging disc. (R. at 618.)[3] In addition, during his many evaluations of the plaintiff, Dr. D. Patel continued to observe restricted forward flexion to thirty degrees, LS tenderness present, and SLR positive on forty-five degrees. (R. at 615, 617, 618.) Following his evaluation on October 14, 1998, Dr. D. Patel recommended restricted activity for the plaintiff and noted she was "still unable to work." (R. at 617.) On November 13, 1998, the plaintiff reported that her left leg had "given away and [she] had a fall at home." (R. at 618.) Dr. D. Patel prescribed Norflex (a muscle relaxant), Motrin, and a back brace for the plaintiff. (*Id.*)

The plaintiff began complaining of muscle spasms and nervousness on February 15, 1999, when she was examined by Dr. D. Patel. (R. at 620.) He noted that she was "depressed but not suicidal or homicidal" and that she had "1 + ankle and knee jerks." (*Id.*) Dr. D. Patel concluded that the plaintiff had "backache and lumber disc syndrome, [and] depression" (*Id.*) Dr. D. Patel prescribed Celebrex, a nonsteroidal anti-inflammatory, and Celexa, an antidepressant, and continued to recommend restricted activity. (*Id.*)

Dr. McConnell examined the plaintiff on March 8, 1999, and he observed a "very limited range of motion with very little self-flexion and extension which is self-limited due to the patient's perception of pain." (R. at 553.) Although Dr. McConnell noted that he believed that the "patient is at maximum medical improvement at this time," he also explained that

> the patient is not totally disabled and could perform light duty work. We are presented with a job description which would require the patient to perform

sedentary of [sic] light work with no lifting over 10–20 lbs. This job to our understanding also would require the patient to work only 2–3 times per week. We feel that the patient would be an appropriate candidate for this.

(*Id.*)

On March 26, 1999, after examining the plaintiff, Dr. D. Patel continued to restrict the plaintiff's activity and stated she was "still off work till further notice." (R. at 621.)

The plaintiff returned to Dr. McConnell on April 5, 1999, and he determined that she had "very superficial tenderness over the lumbar region ... positive rotational simulation tenderness consistent with mild symptom exaggeration. There is no neurologic deficit in the lower extremities." (R. at 551.) Dr. McConnell also opined that there was nothing more that he could do for the plaintiff in regard to treatment and that "the patient is capable of performing the previous job description provided by Bill Dilemme." (R. at 552–53.) In addition, he scheduled the plaintiff for a Functional Capacity Evaluation ("FCE").

The plaintiff reported to Dr. D. Patel on April 12, 1999, that her "back gave away at home yesterday, and she had a fall, and bruised her right hip." (R. at 621.) Dr. D. Patel noted that the plaintiff had "marked LS tenderness present, restricted forward flexion to 20 degrees, 1+ ankle and knee jerks, [and] right hip region contusion and bruise present." (*Id.*) Based on his evaluation, Dr. D. Patel prescribed Lodine, a non-steroidal anti-inflammatory, and recommended applying heat to her back. (*Id.*)

A Functional Capacity Evaluation of the plaintiff was conducted on May 4 and 5, 1999, by Marvin G. Payne, PT, of Preston

---

**3.** There do not appear to be any treatment notes of the plaintiff's examination by the neurosurgeon at the University of Virginia Medical Center in the administrative record.

Square Wellness and a report was produced on May 6, 1999. According to the intake interview, the plaintiff reported "needing some help with personal care, lifting only very light weights, walking 1/4 mile, sitting 1/2 hour, sleeping less than 4 hours a night, severely restricted sex life, restricted social life, and traveling short necessary journeys under 30 minutes." (R. at 564.) The physical therapist noted that throughout the evaluation the plaintiff demonstrated lack of maximum effort, exaggerated symptoms, and had several other areas of inconsistency. Finally, it was determined that the "client did demonstrate the ability to perform sedentary work with accommodation of restricting consecutive sitting or standing to 20 minutes." (R. at 565.)

On May 12, 1999, during an examination of the plaintiff, Dr. McConnell noted that the plaintiff was continuing to complain that she was having difficulty "doing any kind of work." (R. at 549.) In addition, Dr. McConnell reviewed the results of the plaintiff's FCE and determined that "it was felt to be invalid with respect to the lifting portion of the evaluation as she showed lack of maximum effort during all lifts and carries. She also showed several areas of inconsistency in addition to 3/5 positive Waddell signs." (R. at 549.)

After conducting a physical exam, Dr. McConnell opined that the plaintiff "has shown evidence of poor effort with regards to her Functional Capacity Evaluation and does have positive Waddell signs which are suggestive of symptom exaggeration. [W]e have discussed that the patient is not totally disabled and could do at least sedentary to light duty activities." (Id.)

Dr. D. Patel continued to treat the plaintiff for her back pain throughout 1999 and 2000, with medical records indicating visits on October 1, 1999, November 3, 1999, December 1, 1999, February 17, 2000, and March 6, 2000. (R. at 840–43.) His treatment included prescription of non-steroidal anti-inflammatories and restriction of activity. (Id.) On December 1, 1999, Dr. D. Patel noted that the patient's "back condition is progressively getting worse." (R. at 841.)

On November 9, 2000, J. Gutti, M.D., of the Pain Management Clinic examined the plaintiff and evaluated her complaints of lower back pain. (R. at 306.) Dr. Gutti determined that the plaintiff suffered from chronic low back pain with left LE radiculopathy, and parasthesia, intermittent numbness in the right leg, and bilateral SI joint dysfunction. (R. at 308.) Based on his findings, he recommended a bilateral SI joint injection and trigger point injections with local anesthetic and steroids. (Id.) This procedure was completed on December 18, 2000, and the plaintiff reported on January 3, 2001, that she had received relief from the pain for "a few days" and that she graded her pain as a four on a scale of one to ten. (R. at 310.) On February 13 and April 4, 2001, the plaintiff received a lumbar epidural steroid block and a bilateral SI joint injection. (R. at 315–18.) There are no records of the results of these treatments.

The plaintiff was examined by J. Patel, M.D., on May 9, June 12, July 13, October 22, and November 1, 2001 for evaluation of her back pain. (R. at 178–81.) On May 9, 2001, the plaintiff presented with "recurrent back pain in the lower back with radiation to the left leg" and Dr. J. Patel noted the plaintiff complained of chronic dizziness due to labyrinthitis.[4] (R. at 181.) Based on his examination, Dr. J. Patel diagnosed the plaintiff with left lumbar radiculopathy. (Id.) Dr. J. Patel recom-

---

4. Labyrinthitis is an "[i]nflammation of the inner ear, sometimes accompanied by verti-go." *Compact American Medical Dictionary* 248 (1998).

mended the use of Vioxx, Zinacef (for the labyrinthitis) and Loratab. (*Id.*) On June 12, 2001, the plaintiff described that she had "off and on" pain in her lower back with "some radiation to her left leg." (*Id.*) Dr. J. Patel changed his diagnosis to chronic lumbar disc syndrome. (R. at 180.) On July 13, 2001, he noted that "[s]ince last seen, the plaintiff has improved clinically . . . ." (*Id.*)

On October 22, 2001, Dr. J. Patel noted that the plaintiff showed improvement, but still continued to have some pain in her right hip joint. (R. at 178.) After reporting increased pain and numbness in her right foot, Dr. Patel ordered an MRI of the plaintiff's lumbrosacral spine on November 1, 2001.

Regarding her mental status, the plaintiff began seeing Mina Patel, M.D. ("Dr.M.Patel"), in December 1997. During 1997 and the early part of 1998, she presented to Dr. M. Patel with "adjustment reaction with mixed emotional features" due to a custody battle over her granddaughter and her daughter's drug and alcohol problems. (U. at 500.) She was next evaluated by Dr. M. Patel on February 8, 1999. The plaintiff complained that she was feeling depressed regarding her inability to work due to her accident and back pain, and also her continuing problems unrelated to her accident in dealing with her daughter's drug addiction and her son's abusive behavior. (R. at 501.) Dr. M. Patel prescribed Celexa, an anti-depressant, and recommended supportive psychotherapy. (R. at 502.)

The plaintiff's treatment by Dr. M. Patel continued throughout 1999 and 2000. The plaintiff's condition did not change significantly and she continued to complain of significant stress due to both her back pain and the fact that she was having difficul-

ties dealing with her son's and daughter's alcohol and drug abuse. (R. at 503–06, 282–84.) The last documented visit with Dr. M. Patel was on February 19, 2001. At this visit the plaintiff reported to Dr. M. Patel that she had not been taking her prescribed medication and that this had severely affected her ability to relate with others. (R. at 285.) After discussing the situation with Dr. M. Patel, the plaintiff agreed that she would resume taking her medication as prescribed and would continue to receive treatment from Dr. M. Patel. (*Id.*)

Additionally, the plaintiff was examined by Robert S. Spangler, Ed. D., a licensed psychologist in Johnson City, Tennessee, on December 12, 2001. Dr. Spangler noted that Allen "reports stopping four times during the drive to Johnson City to relieve low back pain and left leg pain." (R. at 190.) Dr. Spangler reported that the plaintiff stated that her medical and mental problems began when she was injured in March 1998 and that she developed her nervousness and depression as a result of her back pain. (R. at 191.) During her examination Dr. Spangler noted that "she admitted family stressors but no serious problems with depression and anxiety until her back injury and subsequent pain." (R. at 192.) The plaintiff complained that at times her pain was such that she was unable to concentrate and that she is prone to bouts of crying and has suicidal ideations frequently. (*Id.*)

After performing the Wechsler Adult Intelligence Scale—Third Edition test ("WAIS–III"),[5] Dr. Spangler determined that the Performance I.Q. and Full Scale I.Q. results he obtained were invalid due to the fact that they underestimated the plaintiff's abilities. (R. at 193.) He opined

---

**5.** The Wechsler Adult Intelligence Scale ("WAIS") is a well-recognized intelligence test, first introduced in 1955. It was revised

in 1981 ("WAIS–R") and 1997 ("WAIS–III"). *See* Charles T. Hall, *Social Security Disability Practice* § 7.39 (1998).

that this underestimation was due in part to the plaintiff's psychomotor retardation and erratic concentration. (*Id.*) Dr. Spangler concluded that the plaintiff had average intelligence, borderline performance skills, suffered from Major Depressive Disorder and Anxiety Disorder, and had recurrent suicidal ideations. (R. at 194.)

### III

The plaintiff filed a claim for long-term disability benefits on September 17, 1998. (R. at 682.) The plaintiff claimed disability beginning on March 30, 1998, and stated that she had not returned to work since that date. In the claim for disability benefits, the plaintiff identified Drs. D. Patel, McConnell, and M. Patel as her treating physicians. On the accompanying Attending Physician's Statement, dated September 21, 1998, Dr. D. Patel diagnosed the plaintiff's disabling condition as "low back pain [and] sciatica." (R. at 685.) He also noted that the plaintiff had not achieved maximum medical improvement, was regressing in her condition, but he did not make a determination as to when she would be able to return to work. (*Id.*)

Following the plaintiff's filing for disability benefits, Unum reviewed her medical records and conducted at least one telephone interview with the plaintiff. (R. at 25.) Based on this information, Unum determined that the plaintiff would not be able to return to her previous occupation for at least two years. (R. at 27–28, 645–651.)

On November 5, 1999, Allen received a determination by the Social Security Administration that she was entitled to disability benefits effective September 1999. (R. at 515.)

Unum reevaluated the plaintiff's claim beginning in February 2000, because the policy only allowed payment of benefits after two years if it was shown that the plaintiff could not perform any gainful occupation for which she was qualified. (R. at 524–26, 530–33.) The plaintiff's mental health records from Dr. M. Patel were reviewed by Angela Albert–Mitchell, R.N.C. (R. at 459–50), and Glenn E. Higgins, Ph.D., ABDR. (R. at 458.) Both practitioners determined that the plaintiff did not have any impairments that would significantly preclude her work capacity.

Based on a further review of the medical records and telephone interviews with the plaintiff, on May 15, 2000, Unum determined that the plaintiff had the ability to perform gainful work and was no longer eligible to receive benefits after September 25, 2000. (R. at 447–49.) Additionally, Unum identified five occupations in the plaintiff's labor market that would not only serve to provide her gainful employment, but would also meet the physical restrictions of light sedentary work, as was earlier determined by the plaintiff's treating physician, Dr. McConnell. (R. at 448.)

The plaintiff appealed the denial of benefits and a second review of the plaintiff's case was undertaken by Unum. The plaintiff's medical records from Drs. D. Patel and McConnell were reviewed by Daniel Krell, M.D. Dr. Krell noted that while the plaintiff had degenerative changes in her lumbar spine, there was "no objective evidence to support the presence of a condition that would be expected to produce severe impairment. There is no documentation that the claimant has had a deterioration of her physical condition." (R. at 419.)

The plaintiff also submitted additional medical records consisting of Functional Capacity Evaluations completed by Dr. D. Patel for Unum's consideration. (R. at 428–433.) Although Unum determined on September 26, 2000, that the claim should be denied, Unum decided to continue to pay benefits to the plaintiff until it could be established that other gainful occupa-

tions existed within the plaintiff's labor market. (R. at 416–417.)

In response to the plaintiff's refusal to cooperate with Unum's further investigation of her claim, Unum arranged a field interview and also to have a private investigative company conduct surveillance of the plaintiff's daily activities on March 27, 2001. (R. at 335–347.) The actions of the plaintiff, as observed by the representatives of the private investigative company, were inconsistent with the limitations that the plaintiff had previously claimed. According to the report of the investigative company, the plaintiff was observed walking, shopping, bending, driving long distances, and lifting without difficulty, obvious pain, or need of assistance. (*Id.*)

Relying on the radiological data, Dr. McConnell's observations and treatment, numerous Functional Capacity Evaluations, and its own staff's review of the medical records, Unum issued a denial letter on September 28, 2001. The plaintiff appealed Unum's decision on November 2, 2001. Unum referred the plaintiff's case to Dr. R.B. Keeler for review. Dr. Keeler determined that taking into account the plaintiff's own doctor's restrictions and limitations, she was still capable of performing sedentary or light work. (R. at 175.) Unum issued a final denial letter on January 17, 2002, and this action followed.

## IV

■ The standard to be used by the court in reviewing the decision to deny the plaintiff long-term disability benefits is determined by the language of the employee benefit plan. The court must decide if the plan's language grants the administrator discretion to determine the claimant's eligibility for disability benefits. This standard provides that the decision of the administrator or fiduciary will not be disturbed if it is reasonable, even if this court would have come to a different

conclusion independently. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Brogan v. Holland,* 105 F.3d 158, 161 (4th. Cir.1997). Such a decision is reasonable if it is "the result of a deliberate principled reasoning process and if it is supported by substantial evidence." *Brogan,* 105 F.3d at 161 (internal quotations omitted). Both parties to this action agree that the proper standard of review is abuse of discretion.

■ In this case, a conflict of interest exists because the plan administrator is also the plan's insurer. Therefore, it is necessary to shift the standard of review to the extent necessary in favor of the plaintiff, in order to protect against the potential for bias on the part of the insurer. *See Elliott v. Sara Lee Corp.,* 190 F.3d 601, 605 (4th Cir.1999); *Ellis v. Metropolitan Life Ins. Co.,* 126 F.3d 228, 233 (4th Cir.1997).

■ The plaintiff argues that Unum abused its discretion by failing to give proper weight to the medical evidence and disability determination provided by Dr. D. Patel, and that Unum did not provide a "full and fair review of the record." (Pl. at 13.)

Unum's decision to deny benefits in this case was based upon a review of a voluminous medical file dating from 1997 to 2001. This medical file was continually updated even after the plaintiff's claim was first denied and was reviewed on three separate occasions. Additionally, Unum paid benefits for an additional year past normally authorized coverage in order to ensure that the plaintiff's case was given a complete and objective review.

It is obvious from the record that Unum based their decision to deny benefits on the observations, treatment, and recommendations of one of the plaintiff's treating physicians, Dr. McConnell. Dr. McCon-

nell is a spinal specialist and treated the plaintiff for more than a year following her injury. The record is replete with his assertions that there is no objective evidence to support the plaintiff's claims of debilitating back pain and limitations to her activity. There also is no evidence in the record that there was any further injury to the plaintiff's back that would have increased the severity of her condition after she stopped seeing Dr. McConnell.

Dr. McConnell and Marvin Payne, P.T., both observed characteristics of symptom exaggeration and lack of maximum effort in the plaintiff's functional evaluations and examinations. Coupled with the lack of objective evidence to support the plaintiff's assertions, these observations cast doubt on the severity of the plaintiff's injury and the limitations she now claims. In keeping with his observations and evaluations of the plaintiff's medical condition, Dr. McConnell developed a rational set of functional restrictions and limitations that placed the plaintiff into the sedentary and light work category with even greater restrictions on lifting, sitting, and bending. After taking these restrictions into account, Unum was able to identify five separate gainful occupations that were available to the plaintiff in her labor market.

Additionally, the most recent Physical Capacities Evaluation in the record, completed on November 13, 2001, by Dr. J. Patel, was consistent with the restrictions and limitations imposed by Dr. McConnell and Marvin Payne. These restrictions allowed the patient to undertake any of the five identified alternate occupations within her labor market.

Based on the substantial evidence in the record, I find that Unum did not abuse its discretion in denying the plaintiff's claim for long-term disability benefits.

■ The plaintiff also urges that Unum made its decision in bad faith as demonstrated by the use of covert surveillance of the plaintiff during her normal daily activities. While this surveillance did clearly establish that the plaintiff's daily activities were inconsistent with her claimed disabling condition, the information gathered from the surveillance was not the sole factor in Unum's decision. It was instead a legitimate and useful tool for further evaluating the plaintiff's claims of total disability and accordingly does not show bad faith. *See Delta Family–Care Disability & Survivorship Plan v. Marshall,* 258 F.3d 834, 841 (8th Cir.2001); *McGarrah v. Hartford Life Ins. Co.,* 234 F.3d 1026, 1028–29 (8th Cir.2000); *Conway v. Paul Revere Life Ins. Co.,* 2002 WL 31770489, at *11 (W.D.N.C. Dec. 5, 2002); *Scardo v. Metro. Life Ins. Co.,* 2000 WL 33281679, at *4 (W.D.Va. April 18, 2000).

■ The plaintiff further argues that her mental condition causes her to be completely disabled and prevents her from performing any gainful occupation. As noted in the plaintiff's original claim for long-term disability benefits, the plaintiff claims her only disabling condition was back pain that resulted from an injury occurring at her place of employment. There is no mention of a disabling mental condition. However, the plaintiff now claims that her severe depression and other emotional problems are the direct result of her injury and therefore are covered by the Plan.

An examination of the plaintiff's medical records shows evidence that her emotional problems were due to family problems she had been experiencing since as early as 1997. The plaintiff also "dismissed her depression as being a contributing factor when related to her claim of disability" in an interview with a Unum representative on March 27, 2000. Finally, the only evaluation of the plaintiff's functional mental capacity was determined to be invalid because it underestimated the plaintiff's abilities.

For these reasons, Unum did not abuse its discretion in denying the plaintiff's claim for disability benefits based upon the plaintiff's claims of emotional and mental limitations. Additionally, the Plan limits the availability of coverage for mental illness to twelve months, regardless of the cause of such illness. The plaintiff argues that her mental illness is a direct result of a "traumatic injury" and therefore is excepted from such limitation. However, the Plan is clear that this exception only applies to cases of dementia (R. at 135) of which there is no evidence in the medical record. Even if her mental illness was determined to be a disabling condition, because the plaintiff was paid benefits for a total of thirty-six months, she has received the maximum allowable coverage provided under the Plan.

### V

Given the deferential standard of review in this case, I find that substantial evidence supports Unum's decision to deny benefits. Unum based its decision to deny benefits on the restrictions proposed by Allen's own doctors and the availability of gainful occupations in her labor market. For the foregoing reasons, the defendant's motion for summary judgment will be granted.

An appropriate final judgment will be entered.

### JUDGMENT

For the reasons set forth in the opinion accompanying this final judgment, it is **ADJUDGED AND ORDERED** that the defendant's Motion for Summary Judgment is granted and final judgment is entered for the defendant.

The clerk is directed to close the case.