Thomas C. BOWLING Appellant,

v.

COMMONWEALTH OF KENTUCKY Appellee.

No. 2004–SC–0880–MR.

Supreme Court of Kentucky.

March 17, 2005.

As Modified April 22, 2005.

Rehearing Denied June 7, 2005.

Susan Jackson Balliet, Assistant Public Advocate, Department of Public Advocacy, David M. Barron, Department of Public Advocacy, Frankfort, Counsel for Appellant.

Gregory D. Stumbo, Attorney General, David A. Smith, Ian G. Sonego, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee.

COOPER, Justice.

At the conclusion of a one-week trial in December 1990, a Fayette Circuit Court jury convicted Appellant, Thomas Clyde Bowling, of two counts of murder and one count of assault in the fourth degree. The Commonwealth introduced evidence at trial from which the jury could and did believe beyond a reasonable doubt that Appellant caused his vehicle to collide with a vehicle occupied by Edward Lee and Ernestine Lynn Earley and their two-year-old child while they were parked in front of Mr. and Mrs. Earley's dry cleaning business; and that Appellant exited his vehicle, approached the Earleys' vehicle, and intentionally fired gunshots at them at point-blank range, killing Mr. and Mrs. Earley and wounding their child. Appellant was sentenced to death for each of the two murders. His convictions and sentences were affirmed on direct appeal. *Bowling v. Commonwealth,* 873 S.W.2d 175 (Ky.1993), *cert. denied, Bowling v. Kentucky,* 513 U.S. 862, 115 S.Ct. 176, 130 L.Ed.2d 112 (1994). His Criminal Rule (RCr) 11.42 motion was overruled and that decision was also affirmed on appeal. *Bowling v. Commonwealth,* 981 S.W.2d 545 (Ky.1998), *cert. denied, Bowling v. Kentucky,* 527 U.S. 1026, 119 S.Ct. 2375, 144 L.Ed.2d 778 (1999). His petition in federal district court for a writ of habeas corpus, 28 U.S.C. § 2254, was denied, *Bowling v. Parker,* 138 F.Supp.2d 821 (E.D.Ky.2001), and that decision was affirmed on appeal, *Bowling v. Parker,* 344 F.3d 487 (6th Cir.2003), *cert. denied sub nom., Bowling v. Haeberlin,* —— U.S. ——, 125 S.Ct. 281, 160 L.Ed.2d 68 (2004), thus exhausting all of Appellant's normal avenues of appeal. The Governor of Kentucky signed a death warrant scheduling Appellant's execution for November 30, 2004. KRS 431.240(4). The imminence of the execution spawned the usual flurry of last-minute litigation. *Compare McQueen*

*v. Parker,* 950 S.W.2d 226 (Ky.1997); *McQueen v. Commonwealth,* 949 S.W.2d 70 (Ky.1997), *cert. denied,* 521 U.S. 1130, 117 S.Ct. 2536, 138 L.Ed.2d 1035 (1997); *McQueen v. Patton,* 948 S.W.2d 418 (Ky. 1997); *McQueen v. Commonwealth,* 948 S.W.2d 415 (Ky.1997); *McQueen v. Patton,* 948 S.W.2d 121 (Ky.1997); *McQueen v. Parker,* 948 S.W.2d 121 (Ky.1997). Both this Court and the Franklin Circuit Court have issued orders staying Appellant's execution pending resolution of his various motions and separate actions challenging anew his sentence of death.

This appeal is from the dismissal of a civil action that Appellant filed in the Fayette Circuit Court against Glenn Haeberlin, warden of the Kentucky State Penitentiary where Appellant presently resides on death row, claiming he is exempt from the death penalty because he is mentally retarded. The action is not a petition for a writ of habeas corpus, KRS 419.020, because Appellant does not allege that he is being unlawfully detained. *Fryrear v. Parker,* 920 S.W.2d 519 (Ky.1996) (writ of habeas corpus improper vehicle by which to achieve commutation of sentence as opposed to immediate release). In fact, this action seeks exactly the opposite—continuation of detention in lieu of execution. Nor does Appellant seek a hearing before the circuit court of the county in which he is detained. KRS 419.030. Rather, Appellant styled this action a "Petition to Vacate Thomas C. Bowling's Death Sentence Based on Mental Retardation," citing as procedural authority Civil Rule (CR) 60.02(d) and (f) (motion for relief from final judgment because of (d) fraud affecting the proceedings, or (f) any other reason of an extraordinary nature justifying relief).

Appellant did not name the Commonwealth of Kentucky as a party defendant even though the action seeks modification

of a judgment rendered pursuant to an indictment prosecuted against him by the Commonwealth. CR 19.01. Appellant also moved the Fayette Circuit Court to order the Department of Finance to provide him with funds up to $5,000 to hire a "mental retardation expert" to assist him in the preparation and litigation of this action. The Fayette Circuit Court summarily dismissed both the petition and the motion for funds, concluding that Appellant could not collaterally attack his death sentence by way of a separate civil action, and that Appellant had not timely asserted his mental retardation claim. Appellant appeals to this Court as a matter of right. Ky. Const. § 110(2)(b); *Skaggs v. Commonwealth*, 803 S.W.2d 573, 577 (Ky.1990) (Court of Appeals has no authority to review any matter affecting the imposition of death sentence), *sentence vacated on other grounds, Skaggs v. Parker*, 235 F.3d 261 (6th Cir.2000). For the reasons set forth herein, we affirm.

## I. INDEPENDENT CIVIL ACTION.

Civil Rule 60.02 is an available remedy in a criminal case. *Fanelli v. Commonwealth*, 423 S.W.2d 255, 257 (Ky.1968). The rule was adopted as a substitute for the common law writ of coram nobis, a procedure for addressing "errors in matter[s] of fact which (1) had not been put into issue or passed on, (2) were unknown and could not have been known to the party by the exercise of reasonable diligence and in time to have been otherwise presented to the court, or (3) which the party was prevented from so presenting by duress, fear, or other sufficient cause." *Gross v. Commonwealth*, 648 S.W.2d 853, 856 (Ky.1983). "In summary, CR 60.02 is not a separate avenue of appeal to be pursued in addition to other remedies, but is available only to raise issues which cannot be raised in other proceedings." *McQueen*, 948 S.W.2d 415, 416. Thus, it is

available only to resolve issues that could not have been raised at trial, on direct appeal, or by a motion for relief under RCr 11.42. *Gross*, 648 S.W.2d at 856. Appellant asserts and we agree that CR 60.02 is an appropriate vehicle by which to seek relief from a judgment that is no longer valid because it violates a constitutional right that was not recognized as such when the judgment was entered. However, a CR 60.02 motion is not a separate action but a continuation or reopening of the same proceeding that culminated in the judgment under attack. *Fanelli*, 423 S.W.2d at 257. Thus, the parties would necessarily be the same. Appellant has filed a separate civil action, not a CR 60.02 motion.

Civil Rule 60.03 permits an independent action for relief from a judgment "on appropriate equitable grounds." However, "[r]elief shall not be granted in an independent action if the ground of relief sought has been denied in a proceeding by motion under Rule 60.02 ...." CR 60.03.

> Generally, claimants seeking equitable relief through independent actions must meet three requirements. Claimants must (1) show that they have no other available or adequate remedy; (2) *demonstrate that movants' own fault, neglect, or carelessness did not create the situation for which they seek equitable relief;* and (3) establish a recognized ground—such as fraud, accident, or mistake—for the equitable relief.

*Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 662 (2nd Cir.1997) (emphasis added). Further, an independent action for equitable relief from a judgment is unavailable if the complaining party has, or by exercising proper diligence would have had, an adequate remedy in the original proceedings. Charles A. Wright, Arthur R. Miller & Mary K. Kane,

11 *Fed. Prac. & Proc. Civ.2d* § 2868, at n. 9 (2004 pocket part). The same principle applies in federal habeas proceedings "to prevent a grave miscarriage of justice." *Buell v. Anderson,* 48 Fed.Appx. 491, 498–99 (6th Cir.2002) (quoting *United States v. Beggerly,* 524 U.S. 38, 47, 118 S.Ct. 1862, 1868, 141 L.Ed.2d 32 (1998)), *cert. denied,* 536 U.S. 989, 123 S.Ct. 30, 153 L.Ed.2d 892 (2002). Since an independent action under CR 60.03 is an attack upon a judgment, the original parties to the judgment must be named as party defendants. Kurt A. Philipps, Jr., 7 *Kentucky Practice, Rules of Civil Procedure Annotated,* CR 60.03, cmt. 1, at 453 (5th ed.1995). Appellant's separate civil action was not properly brought under CR 60.03 because Appellant did not name the Commonwealth as the party defendant.

However, the Attorney General, who also defended the previous appeals of the original action, the denial of the RCr 11.42 motion, and the denial of the federal habeas corpus petition, has assumed the defense of this action. For that reason and because this is a death penalty case, we choose not to dismiss it on the technical grounds of counsel error or failure to join indispensable parties. Rather, we will treat the action as having been properly brought under CR 60.03. *Cf. Wallace v. Commonwealth,* 327 S.W.2d 17, 18 (Ky. 1959) (treating complaint for a writ of coram nobis as a motion for relief under CR 60.02(6) [1]). Civil Rule 21 (Misjoinder and nonjoinder of parties) provides:

> Misjoinder of parties is not ground for dismissal of any action. Parties may be dropped or added by order of the court on motion of any party *or of its own initiative at any stage of the action* and on such terms as are just. . . .

(Emphasis added.) Pursuant to CR 21, we have, by separate order, substituted the Commonwealth of Kentucky as party defendant/appellee in place of Haeberlin. Nevertheless, for reasons explained *infra,* Appellant is not entitled to relief from his death sentence because he has not alleged an error that was unknown and could not have been known to him by the exercise of reasonable diligence at the time of his trial, RCr 11.42 motion, or petition for a writ of habeas corpus. *Gross,* 648 S.W.2d at 856; *cf. Collins v. Commonwealth,* 297 S.W.2d 54, 57 (Ky.1956) (writ of coram nobis will not lie where advantage could have been taken of the alleged error at the trial, as where the facts complained of were known before or at the trial or could by due diligence have been ascertained). Nor has he made a prima facie showing of mental retardation that would warrant an evidentiary hearing.

## II. *ATKINS v. VIRGINIA.*

Appellant grounds his attack on his death sentence solely on the United States Supreme Court's holding in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that the Eighth Amendment's proscription against cruel and unusual punishment "places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Id.* at 321, 122 S.Ct. at 2252 (internal citation and quotation omitted). In so holding, the Court abrogated its previous decision in *Penry v. Lynaugh,* 492 U.S.

---

**1.** As adopted effective July 1, 1953 (1952 Ky. Acts, ch. 18), CR 60.02(6) contained a savings clause that "[t]his rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified, or to set aside a judgment for fraud upon the court." In 1960, the provision was deleted and replaced with CR 60.03. *See Brumley v. Lewis,* 340 S.W.2d 599, 599 (Ky.1960). An almost identical savings clause remains a part of Fed. R. Civ. Proc. (FRCP) 60(b).

302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that the Eighth Amendment did not preclude execution of a capital offender solely on the basis of the offender's mental retardation. *Id.* at 340, 109 S.Ct. at 2958. When *Penry* was decided, only the federal Anti–Drug Abuse Act of 1988 [2] and the statutes of two states, Georgia [3] and Maryland,[4] prohibited the execution of mentally retarded offenders. *Id.* at 334, 109 S.Ct. at 2955. *Penry* concluded that such was insufficient, even when added to the then-fourteen states that did not impose the death penalty under any circumstances,[5] to show a national consensus supporting a conclusion that executions of mentally retarded offenders were categorically prohibited by the Eighth Amendment. *Id.* After *Penry* was decided, however:

> In 1990, *Kentucky* and Tennessee enacted statutes similar to those in Georgia and Maryland, as did New Mexico in 1991, and Arkansas, Colorado, Washington, Indiana, and Kansas in 1993 and 1994. In 1995, when New York reinstated its death penalty, it emulated the Federal Government by expressly exempting the mentally retarded. Nebraska followed suit in 1998. There appear to have been no similar enactments during the next two years, but in 2000 and 2001 six more States—South Dakota, Arizona, Connecticut, Florida, Missouri, and North Carolina—joined the procession.

*Atkins,* 536 U.S. at 314–15, 122 S.Ct. at 2248 (emphasis added and footnotes omitted). Considering this evidence and noting that only five of the states that did not prohibit the execution of the mentally retarded "have executed offenders possessing a known IQ [intelligence quotient] less than 70 since we decided *Penry,*" *id.* at 316, 122 S.Ct. at 2249, the Court concluded that the practice had become "truly unusual" so that a national consensus had developed against it. *Id.*

*Atkins* recognized a serious disagreement as to which offenders are, in fact, retarded, *id.* at 317, 122 S.Ct. at 2250, and specifically assigned to the states the authority to resolve this issue.

> As was our approach ... with regard to insanity, we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.

*Id.* (internal citation and quotation omitted). The Court then noted uncritically that the definitions of mental retardation in the various existing state statutes were not identical, "but generally conform to the clinical definitions set forth in n. 3, *supra.*" *Id.* n. 22. In footnote 3, *Atkins* quoted at length from the definitions of mental retardation provided in American Association on Mental Retardation (AAMR), *Mental Retardation: Definition, Classification, and Systems of Supports* (9th ed.1992) (hereinafter *"Mental Retardation"*), and American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.2000) (hereinafter "DSM–IV"):

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized

---

2. *Now see* 21 U.S.C. § 848(e)(2)(1).

3. Ga.Code Ann. § 17–7–131(j) (Supp.1988).

4. Md.Code Ann., Art. 27, § 412(f)(1) (1989), *repealed* 2002 Md. Acts, ch. 26, § 1; *now see* Md.Code, Crim. Law § 2–202(b)(2).

5. Today, only twelve states do not impose the death penalty under any circumstances: Alaska, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, North Dakota, Rhode Island, Vermont, West Virginia and Wisconsin.

by significantly subaverage intellectual functioning, *existing concurrently with* related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).[6]

The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) *that is accompanied by* significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). *"Mild" mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.* Id., at 42–43.

536 U.S. at 309 n. 3, 122 S.Ct. at 2245 n. 3 (emphasis added). Both definitions require the concurrence of three criteria: (1) significantly subaverage intellectual functioning, and (2) significant limitations in adaptive functioning in at least two skill areas, (3) both of which became manifest prior to age eighteen. *See also id.* at 318, 122 S.Ct. at 2250. All three criteria must be satisfied before a person is deemed mentally retarded. *Accord Murphy v. State,* 66 P.3d 456, 459 (Okla.Crim.App. 2003). Thus, if the offender does not have an IQ in the mental retardation range, he or she is not deemed mentally retarded despite the presence of significant limitations in adaptive functioning that became manifest before age eighteen. The offender in *Atkins* had an IQ of 59, which qualified him as "mildly mentally retarded," thus eligible for the exemption under the "significantly subaverage intellectual functioning" criterion. *Id.* at 308–09, 122 S.Ct. at 2245. The case was subsequently remanded to the trial court for a new sentencing hearing solely on the issue of mental retardation. *See Atkins v. Commonwealth,* 266 Va. 73, 581 S.E.2d 514, 517 (2003).

In summary, *Atkins* (1) held that the execution of a mentally retarded offender is proscribed by the Eighth Amendment of the United States Constitution; (2) assigned to the separate states the authority to determine who is a mentally retarded offender; (3) cited with approval the three criteria established by the AAMR and the American Psychiatric Association as necessary to prove mental retardation;[7] (4) cit-

---

**6.** The tenth edition of *Mental Retardation* contains a more concise definition: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." *Mental Retardation* 1 (10th ed.2002).

**7.** *See Hill v. Anderson,* 300 F.3d 679, 682 (6th Cir.2002) ("[W]hen discussing retardation in *Atkins,* the Supreme Court cited with approval psychologists' and psychiatrists' 'clinical definitions of mental retardation,' and presumably expected that states will adhere to these clinically accepted definitions when evaluating an individual's claim to be retarded.")

ed uncritically the DSM–IV's recognition that a "mildly mentally retarded" person typically has an IQ of 50–55 to approximately 70; and (5) cited uncritically Kentucky's already-existing statutory scheme proscribing the execution of mentally retarded offenders.

*Atkins* did not specifically address (6) whether its holding was retroactive; (7) whether the issue can be procedurally defaulted (waived) by a failure to timely assert it; (8) the time frame, if any, at which a finding of mental retardation is relevant, *i.e.,* time of offense, time of trial, or time of execution; (9) whether the issue is to be resolved by judge or jury; (10) allocation of the burden of proof and the standard of proof applicable to that burden, *e.g.,* preponderance of the evidence, clear and convincing evidence, or beyond a reasonable doubt; and (11) what showing, if any, is required to trigger entitlement to a trial or evidentiary hearing on the issue.

### III. KENTUCKY STATUTES.

The relevant Kentucky statutes provide *inter alia:*

**KRS 532.130. Definitions for KRS 532.135 and 532.140.**

. . .

(2) A defendant with significant subaverage intellectual functioning existing concurrently with substantial deficits in adaptive behavior and manifested during the developmental period is referred to in KRS 532.135 and 532.140 as a seriously mentally retarded defendant. "Significantly subaverage general intellectual functioning" is defined as an intelligence quotient (I.Q.) of seventy (70) or below.

**KRS 532.135. Determination by court that defendant is mentally retarded.**

(1) At least thirty (30) days before trial, the defendant shall file a motion with the trial court wherein the defendant may allege that he is a seriously mentally retarded defendant and present evidence with regard thereto. The Commonwealth may offer evidence in rebuttal.

(2) At least ten (10) days before the beginning of the trial, the court shall determine whether or not the defendant is a seriously mentally retarded defendant in accordance with the definition in KRS 532.130.

(3) The decision of the court shall be placed in the record.

(4) The pretrial determination of the trial court shall not preclude the defendant from raising any legal defense during the trial. If it is determined the defendant is a seriously mentally retarded offender, he shall be sentenced as provided in KRS 532.140.

**KRS 532.140. Mentally retarded offender not subject to execution—Authorized sentences.**

(1) [N]o offender who has been determined to be a seriously mentally retarded offender under the provisions of KRS 532.135, shall be subject to execution. The same procedure as required in KRS 532.025 and 532.030 shall be utilized in determining the sentence of the seriously mentally retarded offender under the provisions of KRS 532.135 and KRS 532.140.

(2) The provisions of KRS 532.135 and 532.140 do not preclude the sentencing of a seriously mentally retarded offender to any other sentence authorized by KRS 532.010, 532.025, or 532.030 for a crime which is a capital offense.

(3) The provisions of KRS 532.135 and 532.140 shall apply only to trials commenced after July 13, 1990.

In summary, our statutory scheme (1) prohibits the execution of a "seriously

mentally retarded" offender, defined by the same three criteria established by the AAMR and the American Psychiatric Association and approved in *Atkins*, KRS 532.130(2);[8] (2) defines the criterion of "significantly subaverage general intellectual functioning" as an IQ of 70 or below, *id.;* (3) places the burden on the defendant to allege and prove that he or she qualifies for the exemption, KRS 532.135(1), but does not establish the standard of proof applicable to that burden; (4) requires that the issue be decided by a trial judge at least ten days prior to trial, KRS 532.135(2); and (5) is not retroactive but applies only to trials commenced after July 13, 1990, the effective date of the Act.

It does not address (6) the time frame, if any, at which a finding of mental retardation is relevant, other than that the determination must be made prior to trial, not, *e.g.,* prior to execution; and (7) what showing, if any, is required to trigger entitlement to an evidentiary hearing on the issue.

## IV. RETROACTIVE APPLICATION.

█ The principles enunciated in *Atkins* recognized a new constitutional right and, therefore, must be retroactively applied. In *Penry,* the Court had noted:

> In *Teague* [*Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)], we concluded that a new rule will not be applied retroactively to defendants on collateral review unless it falls within one of two exceptions.... [T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct *but also rules prohibiting a certain category of punishment for a class of defendants be-*

*cause of their status* or offense. Thus, if we held as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be *applicable to defendants on collateral review.*

492 U.S. at 329–30, 109 S.Ct. at 2952–53 (emphasis added).

Appellant did not raise the issue during normal collateral review even though *Atkins* was decided six months before oral argument was held on his habeas appeal to the Sixth Circuit. Nevertheless, the courts that have considered the issue apparently agree that the claim may be asserted at any stage of the proceedings, presumably up to the moment of execution. *E.g., In re Holladay,* 331 F.3d 1169, 1173, 1176 (11th Cir.2003) (granting successive habeas petition asserting entitlement to mental retardation exemption, staying execution three days before date of scheduled execution, and observing that petitioner's mental retardation claim had never been adjudicated); *In re Morris,* 328 F.3d 739, 740 (5th Cir.2003) ("[T]he claim ... relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, *that was previously unavailable.*") (emphasis added) (quoting 28 U.S.C. § 2244(b)(2)(A), defining grounds for granting successive habeas petitions); *State v. Williams,* 831 So.2d 835, 851 n. 21 (La.2002) ("The mandate of Atkins that the State may not execute a mentally retarded person is retroactive to any case at any stage of the proceedings, ... in which the defendant is facing the prospect of capital

---

8. Use of the word "deficits," as opposed to "deficit," reflects a legislative intent to require "two or more deficits," in accordance with the definitions formulated by the AAMR and the American Psychiatric Association.

punishment."); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1013, 1015 (2002) (*Atkins* was decided after the execution date was set; principle of *res judicata* did not bar the claim because petitioner had not been afforded the opportunity to fully litigate the issue). Thus, if a condemned mentally retarded offender had been tried prior to the effective date of the Kentucky statutes, *Atkins* would exempt that offender from the death penalty.

## V. PROCEDURAL DEFAULT.

As noted in Part IV of this opinion, *supra,* one reason for giving retroactive effect to *Atkins* is that it created a new constitutional right that offenders such as those in *Holladay, Morris,* and *Lott* had not previously had an opportunity to assert. That, of course, would not be true if the state in which the conviction was obtained, *e.g.,* Kentucky, had in effect at the time of the condemned person's trial a statute affording the same right subsequently created by *Atkins.* "*Atkins* merely reaffirmed this State's preexisting prohibition against executing the mentally retarded." *Anderson v. State,* No. CR 02–910, 357 Ark. 180, ——, 163 S.W.3d 333, 354–55, 2004 WL 907615 (Ark. Apr. 29, 2004). *See also In re Hicks,* 375 F.3d 1237, 1240 (11th Cir.2004) (distinguishing *Holladay* and denying mental retardation claim in part because petitioner had unsuccessfully litigated the issue both during his state trial, relying on a Georgia case holding that execution of the mentally retarded is prohibited by Georgia's Constitution, *Fleming v. Zant,* 259 Ga. 687, 386 S.E.2d 339, 342 (1989), and in his federal habeas petition under a Georgia statute that prohibits execution of the mentally retarded, Ga.Code Ann. § 17–70–131).

■ Even a constitutional right can be waived by failure to timely assert it.

*Breard v. Greene,* 523 U.S. 371, 376, 118 S.Ct. 1352, 1355, 140 L.Ed.2d 529 (1998) (rules of procedural default apply to constitutional provisions).

No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.

*Coleman v. Thompson,* 501 U.S. 722, 751, 111 S.Ct. 2546, 2565, 115 L.Ed.2d 640 (1991) (internal citation and quotation omitted). *See also Sawyer v. Whitley,* 945 F.2d 812, 823–24 (5th Cir.1991) (claim of incompetency to stand trial partially because of mental retardation procedurally defaulted where not asserted at trial), *aff'd, Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *cf. Bonar v. Commonwealth,* 180 Ky. 338, 202 S.W. 676, 677 (1918) (waiver may be either by express consent, by failure to assert in time, or by conduct inconsistent with a purpose to insist on it). "[T]he question is . . . whether at the time of the default the claim was 'available' at all." *Smith v. Murray,* 477 U.S. 527, 537, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986).

■ Appellant's reliance on *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), is misplaced. *Lockett* stands only for the proposition that a state may not cut off in an absolute manner a defendant's right to present mitigating evidence. *Johnson v. Texas,* 509 U.S. 350, 361, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993). The Commonwealth did not prevent Appellant from presenting his mental retardation claim; he simply did not assert it at his trial or in his RCr 11.42 motion. Kentucky's exemption statute, KRS 532.140(1), was enacted

effective July 13, 1990.[9] Appellant's trial began on December 10, 1990. During the interim, Appellant was examined by two psychologists, one appointed by the trial court and the other selected by his attorneys. Each psychologist administered a separate IQ test, the results of which measured Appellant's IQ at 86 and 87, respectively. Thus, Appellant was afforded both the opportunity to assert his mental retardation claim and the expert witnesses necessary to prove it (if it was provable). He chose not to assert the claim at trial and thereby waived it. *Accord Winston v. Commonwealth,* 268 Va. 564, 604 S.E.2d 21, 51 (2004) ("Winston's remaining claims concerning the subject of mental retardation are waived because he deliberately declined to raise a claim of mental retardation under the statutory provisions that apply to him and his trial."). *Compare Head v. Hill,* 277 Ga. 255, 587 S.E.2d 613, 620 (2003) (defendant could have litigated the issue of his alleged mental retardation at trial but chose not to do so, thus, he was not denied the right to litigate the issue; he had such a right and waived it); *with Rogers v. State,* 276 Ga. 67, 575 S.E.2d 879, 880 (2003) (defendant who was tried *before* effective date of mental retardation exemption statute could not be held to have waived claim to exemption).

\* \* \*

Appellant, however, further asserts that Kentucky's mental retardation exemption statutes did not afford him a constitutionally sufficient opportunity to prove his entitlement to the exemption at his 1990 trial because the statutes do not comply with *Atkins* or, alternatively, are procedurally unconstitutional because (1) he claims to be mildly mentally retarded and KRS 532.140(1) exempts only "seriously mentally retarded" offenders; (2) they deny a

defendant the right to a trial by jury on the issue; and (3) they place the burden on the defendant to prove that he is entitled to the exemption. He also claims by implication that (4) the issue of mental retardation does not ripen for adjudication until the Commonwealth gives notice of an immediate intent to carry out the execution by requesting a death warrant. Thus, he claims that his failure to raise the issue at his original trial does not amount to a procedural default and that he is now entitled to have a jury decide the issue in accordance with *Atkins* and other recently rendered United States Supreme Court decisions.

Alternatively, Appellant urges us to adopt the United States Supreme Court's policy of granting further review of a procedurally defaulted constitutional claim when "the prisoner can demonstrate cause for the default *and* actual prejudice as a result of the alleged violation of federal law, *or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman,* 501 U.S. at 749–50, 111 S.Ct. at 2564–65 (emphasis added) (internal citations and quotations omitted). Assuming default has occurred, Appellant does not demonstrate any cause other than his own failure to raise it. (He did not claim in his RCr 11.42 motion that his counsel were ineffective for failing to claim the exemption.)

The "miscarriage of justice" exception applies "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," and permits review even in the absence of a showing of cause for the procedural default. *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In the context of a death sentence, "actual innocence" means "that there was

---

**9.** 1990 Ky. Acts, ch. 488.

no aggravating circumstance or that *some other condition of eligibility had not been met." Sawyer v. Whitley,* 505 U.S. at 345, 112 S.Ct. at 2522 (emphasis added). In that circumstance, the petitioner must "show by clear and convincing evidence that but for constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty." *Id.* at 350, 112 S.Ct. at 2525. We agree that if Appellant could prove that he is mentally retarded, such would satisfy the "clear and convincing" standard in that regard. Appellant asserts that (5) he has made a sufficient prima facie showing that he is mentally retarded to warrant a new sentencing trial to prove it, and if a new trial is not granted, the probable result will be the execution of an actually mentally retarded person who is ineligible for the death penalty under the Eighth Amendment.

For the reasons set forth *infra,* we conclude that our statutory scheme is neither unconstitutional nor contrary to *Atkins* or any other United States Supreme Court precedent. We have also examined the statutes and case law of other states that have specifically exempted mentally retarded offenders from the death penalty and conclude that our exemption provisions are consistent with those of a substantial majority of those states and not unique to Kentucky. Finally, Appellant has not made a prima facie showing sufficient to create a doubt as to whether he is mentally retarded; thus, the denial of his demand for a new sentencing trial or an evidentiary hearing will not result in a fundamental miscarriage of justice.

## VI. DEFINITION OF "MENTALLY RETARDED."

■ As recognized by *Atkins,* the definition in KRS 532.130(2) of a person qualified for the mental retardation exemption

from the death penalty generally conforms to the clinical definitions set forth in *Mental Retardation* and DSM–IV. 536 U.S. at 317 n. 22, 122 S.Ct. at 2250 n. 22. Nevertheless, Appellant asserts that by exempting only the "seriously mentally retarded," KRS 532.140(1) unconstitutionally permits the execution of "mildly mentally retarded" offenders. That assertion is belied by the statute's definition of the "significantly subaverage general intellectual functioning" criterion as an IQ of 70 or below, which includes the "mildly mentally retarded" per DSM–IV at 42–43, cited by *Atkins,* 536 U.S. at 309 n. 3, 122 S.Ct. at 2245 n. 3. Further:

> *To be classified as mentally retarded a person generally must have an IQ of 70 or below.* Under the AAMR classification system, individuals with IQ scores between 50–55 and 70 have "mild" retardation. Individuals with scores between 35–40 and 50–55 have "moderate" retardation. "Severely" retarded people have IQ scores between 20–25 and 35–40, and "profoundly" retarded people have scores below 20 or 25.

*Penry,* 492 U.S. at 308 n. 1, 109 S.Ct. at 2941 n. 1 (emphasis added) (citing AAMR, *Classification in Mental Retardation* 11, 13 (H. Grossman ed.1983)). The fact that our statute refers to persons with IQs of 70 or below as "severely" mentally retarded does not change the fact that an IQ of 70 or below includes the mildly, moderately, severely and profoundly mentally retarded. Our statutory scheme was enacted shortly after *Penry* and presumably relied on *Penry* and the AAMR in establishing an IQ of 70 as the ceiling for the exemption.

Fourteen of the twenty-six states that presently have statutes exempting the mentally retarded from the death penalty define the "significantly subaverage intellectual functioning" criterion as either an

IQ of 70 or below[10] or two or more standard deviations below the mean.[11] The two definitions are essentially the same because the mean IQ is 100 and a standard deviation is fifteen on the Wechsler Adult Intelligence Scale (3rd ed.) (WAIS–III) and sixteen on the Stanford–Binet Intelligence Scale (4th ed.), the two norms that are now most frequently used to assess a person's IQ. *Mental Retardation* 59, 61–62 (10th ed.2002). In addition, the courts of three states that do not have death penalty exemption statutes have recognized that a person must have an IQ of 70 or below to qualify for the *Atkins* exemption. *Ex Parte Perkins*, 851 So.2d 453, 456 (Ala. 2002), *cert. denied Perkins v. Alabama*, 540 U.S. 830, 124 S.Ct. 69, 157 L.Ed.2d 55 (2003); *Murphy v. State*, 54 P.3d 556, 568 (Okla.Crim.App.2002); *Ex Parte Briseno*, 135 S.W.3d 1, 14 (Tex.Crim.App.2004); *cf. Lott*, 779 N.E.2d at 1014 (rebuttable presumption that defendant is not mentally retarded if IQ is above 70).

■ Appellant next asserts that our statute does not take into account a "measurement error of approximately five points in assessing IQ, although this may vary from instrument to instrument.... Thus, it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." DSM–IV at 41–42. He also complains that our statute fails to consider the so-called "Flynn effect," a finding made in the 1980s that as time passes and IQ test norms grow older, the mean IQ score tested by the same norm will increase by approximately three points per decade. James R. Flynn, *Massive IQ Gains in 14 Nations: What IQ Tests Really Measure*, 101 Psych. Bull. 171–91 (1987 No. 2).[12] Depending on the age of the norm, an IQ measured at 74 could actually be, *e.g.*, 71 or 68. The psychologist chosen by Appellant's attorneys in 1990 used the Shipley–Hartford Intelligence Scale to assess Appellant's IQ at 87. The psychologist appointed by the court to examine Appellant used the Wechsler Adult Intelligence Scale (rev. ed.) (WAIS–R) norm to assess Appellant's IQ at 86. The WAIS–R was last updated in 1981 and was superseded by the WAIS–III norm in 1997. *Allen v. Unum Life Ins. Co. of Am.*, 289 F.Supp.2d 745, 752 n. 5 (W.D.Va.2003) (citing Charles T. Hall, *Social Security Disability Practice* § 7.39 (1998)). Appellant asserts that because of the potential five-point margin of measurement error and the possible three-point "Flynn effect," the statutory definition of "significantly subaverage general intellectual functioning" in KRS 532.130(2) as an

**10.** Del.Code Ann., tit. 11, § 4209(d)(3)(d)(2); Idaho Code § 19–2515A(1)(b); Ky.Rev.Stat. 532.130(2); Md.Code Ann., Crim. Law, § 2–202(b)(1)(i); Neb.Rev.Stat. § 28–105.01(3) (IQ of 70 or below presumptive evidence of mental retardation); N.M. Stat. Ann. § 31–20A–2.1(A) (same); N.C. Gen.Stat. § 15A–2005(a)(1)(c); S.D. Codified Laws § 23A–27A–26.2 (IQ exceeding 70 presumptive evidence of absence of mental retardation); Tenn.Code Ann. § 39–13–203(a)(1); Wash. Rev.Code § 10.95.030(2)(c).

**11.** Conn. Gen.Stat. § 1–1g(b); Fla. Stat. Ann. § 921.137(1); Kan. Stat. Ann. §§ 21–4623(e) & 76–12b01(i) Va.Code Ann. § 19.2–264.3:1.1(A).

**12.** The scientific community does not agree on the cause of this phenomenon. Flynn attributes it to environmental factors, *e.g.*, the advent of television and the greater cognizant demands of industrial employment. James R. Flynn & William T. Dickens, *Heritability Estimates Versus Large Environmental Effects: The IQ Paradox Resolved*, 108 Psych. Rev. (April 2001). There are other theories, including, *e.g.*, better nutrition. Richard Lynn, *The Role of Nutrition in Secular Increases in Intelligence*, 11 Personality & Individual Differences 273–85 (1990 No. 3).

IQ of 70 or below should be interpreted to mean "an IQ of 75–80 or below." As will be further discussed *infra,* the significance of this assertion is Appellant's claim in his brief and at oral argument that while he was in junior high school (age thirteen), his IQ was assessed at 74, which would fall within his proposed revised definition. His argument appears to be that his IQ could be as low as 69 based on the measurement at age thirteen and that his 1990 WAIS–R assessment could have been inflated by the "Flynn effect" and the margin of measurement error. (If so, however, the 1990 WAIS–R assessment still could not have been less than IQ 78.)

Recognizing "serious disagreement . . . in determining which offenders are in fact retarded," and that "[n]ot all people who claim to be mentally retarded will be so impaired . . . ," *Atkins,* 536 U.S. at 317, 122 S.Ct. at 2250, the United States Supreme Court left it to the states to formulate their own definitions, so long as they "generally conform[ed] to the clinical definitions" established by the AAMR and the American Psychiatric Association as approved in *Atkins.* *Id.* at 317 n. 22, 122 S.Ct. at 2250; *Hill,* 300 F.3d at 682. Both the potential margin of error and the "Flynn effect" were known at the time our statutes were enacted. The General Assembly chose not to expand the mental retardation ceiling by requiring consideration of those factors, but instead, like most other states that quantify the definition,[13] chose a bright-line cutoff ceiling of an IQ of 70, a generally recognized level at which persons are considered mentally retarded. *Atkins* did not discuss margins of error or the "Flynn effect" and held that the definition in KRS 532.130(2) "generally conform[ed]" to the approved clinical definitions. 536 U.S. at 317 n. 22, 122 S.Ct. at 2250 n. 22.

Arizona[14] and Illinois[15] do define "significantly subaverage intellectual functioning" as an "IQ of 75 or below." No doubt, otherwise "death-eligible" defendants in those states with IQs higher than 75 will claim that those statutes should be interpreted to mean that a person with an IQ of 80 to 85 is "exempt-eligible." Arkansas's statute, on the other hand, creates a rebuttable presumption of mental retardation if the defendant has an IQ of 65 or below,[16] and *Atkins* also held that statute to "generally conform" to the approved clinical definitions. *Id.* at 317 n. 22, 122 S.Ct. at 2250, n. 22. The remaining nine states[17] with statutory exemptions have chosen not to numerically quantify the definition of "significantly subaverage intellectual functioning," presumably relegating the issue to a "battle of the experts." "Generally, accepted definitions within the scientific community will no doubt be refined as our knowledge of this area advances." *Howell v. State,* 151 S.W.3d 450, 455–56 (Tenn. 2004). However, absent proof that the statutory definition of "significantly subaverage general intellectual functioning" in KRS 532.130(2) is unconstitutional, any change in that definition must emanate from the General Assembly, not this Court.

---

**13.** *See* statutes cited in notes 11 and 12, *supra.*

**14.** Ariz.Rev.Stat. § 13–703.02(C).

**15.** Ill. Comp. Stat., ch. 725, § 5/114–15(d) (IQ of 75 or below presumptive evidence of mental retardation).

**16.** Ark.Code Ann. § 5–4–618(a)(2).

**17.** Cal.Penal Code § 1376(a); Colo.Rev.Stat. § 18–1.3–1101, *et seq.;* Ga.Code Ann. § 17–7–131(a)(3); Ind.Code § 35–36–9–2; La.Code Crim. Proc. Art. 905.5.1(H)(1); Mo.Rev.Stat. § 565.030.6; Nev.Rev.Stat. 174.098(7); N.Y.Crim. Proc. Law § 400.27(12)(e); Utah Code Ann. § 77–15a–102.

When it decided in *Atkins* to delegate to the states the authority to formulate their own definitions of "mentally retarded," the United States Supreme Court obviously anticipated that the definitions would vary in some respects but would be acceptable if they "generally conform[ed] to the clinical definitions" approved therein. 536 U.S. at 317, n. 22, 122 S.Ct. at 2250, n. 22; *Hill,* 300 F.3d at 682. The General Assembly's adoption of a bright-line maximum IQ of 70 as the ceiling for mental retardation "generally conform[s]" to the clinical definitions approved in *Atkins,* thus does not implicate the Eighth Amendment's proscription against "cruel and unusual" punishment. As did the Supreme Court of Tennessee when faced with this same argument, we decline to rewrite this unambiguous statute. *Howell,* 151 S.W.3d at 455–56.

## VII. RELEVANT TIME FRAME.

■ The rationale articulated in *Atkins* for prohibiting the execution of mentally retarded offenders was that such offenders have diminished personal culpability because "they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders," 536 U.S. at 318, 122 S.Ct. at 2250 (footnote omitted); and that the execution of such offenders does not further the goals of either retribution, because a mentally retarded offender's crimes do not reflect "a consciousness materially more depraved than that of any other person guilty of murder," *id.* at 319, 122 S.Ct. at 2251 (internal citation and quotation omitted), or deterrence, because "capital punishment can serve as a deter-

rent only when murder is the result of premeditation and deliberation," *id.* (internal citation and quotation omitted), and the execution of a mentally retarded offender is unlikely to deter other mentally retarded persons from committing similar crimes. *Id.* at 320, 122 S.Ct. at 2251.

The Court did not state as a rationale that, *e.g.,* the offender does not have the ability to understand that he or she is about to be executed or why, KRS 431.213(2) (definition of insanity for purpose of death penalty exemption), or "has no capacity to come to grips with his own conscience or deity." *Ford v. Wainwright,* 477 U.S. 399, 409, 106 S.Ct. 2595, 2601, 91 L.Ed.2d 335 (1986) (holding that the Eighth Amendment prohibited the execution of an insane offender who was sane when he committed the offense). If diminished personal culpability is the rationale for not executing a mentally retarded offender, logic dictates that the diminished culpability exist at the time of the offense, not necessarily at the time of the execution. Both *Atkins,* 536 U.S. at 321, 122 S.Ct. at 2252, and KRS 532.140(1) prohibit imposition of the death penalty on a "mentally retarded offender." Presumably, a person becomes an "offender" at the time of the offense.

If the relevant time frame were the time of execution, there would exist the possibility that the IQ test would be "significantly skewed by potential depression, tension, and anxiety on the part of [the] defendant," or that the "defendant may arguably perceive a stronger motivation to malinger where the reality of facing the death penalty becomes more immediate." [18]

---

18. The Mississippi Supreme Court has required that the Minnesota Multiphasic Personality Inventory–II (MMPI–II) test be administered when assessing whether a defendant is mentally retarded because it is the test best suited to detect malinger-

ing. *Goodin v. State,* 856 So.2d 267 (Miss.2003), *cert denied,* 541 U.S. 947, 124 S.Ct. 1681, 158 L.Ed.2d 375 (2004); *Russell v. State,* 849 So.2d 95, 148 (Miss. 2003); *Foster v. State,* 848 So.2d 172, 175 (Miss.2003); *see also United States v. Bat-*

*United States v. Beckford,* 962 F.Supp. 748, 762 n. 13 (E.D.Va.1997) (upholding constitutionality of requirement in 21 U.S.C. § 848(1) of pretrial notice and pretrial examination for purpose of penalty phase mental health defenses, including exemption from death penalty because of mental retardation). That requirement spares both the Commonwealth and the defendant the time-consuming burdens of death-qualifying a jury and conducting a futile death-penalty sentencing trial. *Accord State v. Williams,* 831 So.2d 835, 860 (La.2002); *State v. Flores,* 135 N.M. 759, 93 P.3d 1264, 1269 (2004).

The issue is more semantical than real. Since mental retardation is a developmental disability that becomes apparent before adulthood, *Heller v. Doe,* 509 U.S. 312, 321–22, 113 S.Ct. 2637, 2643, 125 L.Ed.2d 257 (1993) (citing DSM–III 29 (1987) and *Mental Retardation* 16–18 (1992)), it would be exceedingly rare for the condition to develop after the offense. And since mental retardation, as contrasted with mental illness, is generally regarded as a permanent, relatively static condition, *id.* at 323, 113 S.Ct. at 2644 (citing S. Brakel, J. Parry & B. Weiner, *The Mentally Disabled and the Law* 37 (3d ed.1985)), though it may be ameliorated somewhat through education and habilitation, James W. Ellis & Ruth A. Luckasson, *Mentally Retarded Criminal Defendants,* 53 Geo. Wash.

L.Rev. 414, 424 n. 54 (March/May 1985), it would be equally as rare for the condition to recede during the interim between the offense and the execution.

We find nothing unconstitutional or contrary to *Atkins* in the requirement in KRS 532, 135 that mental retardation be determined prior to trial. Of course, that requirement would be unconstitutional if applied to a defendant who was tried and sentenced to death prior to July 13, 1990, and, thus, who had never been afforded an opportunity to assert and prove entitlement to the exemption. Appellant is not within that category.

## VIII. JUDGE OR JURY.

■ Relying on the recent United States Supreme Court decisions in *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), Appellant asserts that KRS 532.135(2) is unconstitutional because, by designating the trial judge as the factfinder with respect to whether a defendant is entitled to the mental retardation exemption, the statute denies him his Sixth Amendment right to a trial by jury.[19] We disagree.

In *Apprendi,* a New Jersey statute[20] permitted the enhancement of the maximum sentence for a criminal offense if the

tle, 235 F.Supp.2d 1301, 1307 (N.D.Ga. 2001) ("MMPI is generally agreed to be difficult to cheat on without getting caught").

**19.** Appellant's claim to a trial by jury is premised solely on the Sixth and Fourteenth Amendments of the United States Constitution. He does not claim that Sections 7 and 11 of the Constitution of Kentucky entitle him to a jury trial on this issue. Section 7 provides that "[t]he ancient mode of trial by jury shall be held sacred, and the right thereof remain inviolate .... " Section 11 guarantees a criminal defendant the right to "a speedy

public trial by an impartial jury of the vicinage." We have long held that these Sections pertain only to the issue of guilt or innocence and not "to the fixing of the penalty since that function was no part of the common law mode of trial." *Allison v. Gray,* 296 S.W.2d 735, 737 (Ky.1956). *See also Perry v. Commonwealth,* 407 S.W.2d 714, 715 (Ky.1966); *Williams v. Jones,* 338 S.W.2d 693, 694 (Ky. 1960); *Lee v. Buchanan,* 264 S.W.2d 661, 661 (Ky.1954).

**20.** N.J. Stat. Ann. § 2C:44–3(e).

trial judge found by a preponderance of the evidence that "[t]he defendant in committing the crime acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity," *i.e.*, that the offense was a "hate crime." The defendant pled guilty to an offense that carried a maximum sentence of ten years in prison. The trial judge found by a preponderance of the evidence that the "hate crime" enhancement applied and sentenced him to twelve years in prison. Describing as a "novelty" a "legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone," 530 U.S. at 482–83, 120 S.Ct. at 2359, the United States Supreme Court held that the statute violated the Sixth Amendment right to trial by jury. *Id.* at 497, 120 S.Ct. at 2366–67. *See Duncan v. Louisiana*, 391 U.S. 145, 156, 88 S.Ct. 1444, 1451, 20 L.Ed.2d 491 (1968) (Sixth Amendment right to trial by jury made applicable to states by Fourteenth Amendment).

> "[S]entencing factor" ... appropriately describes a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence *within the range* authorized by the jury's finding that the defendant is guilty of a particular offense. On the other hand, when the term "sentence enhancement" is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict.

*Apprendi*, 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19.

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Id.* at 490, 120 S.Ct. at 2362–63.

*Ring* held that an Arizona statute [21] that allowed the trial judge, sitting alone, to find the presence or absence of an aggravating factor required for imposition of the death penalty was unconstitutional for the same reasons articulated in *Apprendi*, overruling *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443.

> Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," ... the Sixth Amendment requires that they be found by a jury.
>
> ...
>
> The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both.

*Id.* (internal citation omitted).

Appellant argues that the *absence* of mental retardation is "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U.S. at 494 n. 19, 120 S.Ct. at 2365 n. 19, because it is "a fact necessary to put him to death," *Ring*, 536 U.S. at 609, 122 S.Ct. at 2443; *ergo*, a jury must find the absence of mental retardation beyond a reasonable doubt before the death penalty can be imposed. The United States Supreme Court has recently held that "[n]othing prevents a defendant from

---

**21.** Ariz.Rev.Stat. § 13–703(C).

waiving his *Apprendi* rights," [22] *Blakely v. Washington,* 542 U.S. 296, ——, 124 S.Ct. 2531, 2541, 159 L.Ed.2d 403 (2004), and that *Ring* is not retroactive to cases already final on direct review. *Schriro v. Summerlin,* 542 U.S. 348, ——, 124 S.Ct. 2519, 2526, 159 L.Ed.2d 442 (2004). Regardless, Appellant's argument overlooks the distinction between aggravating factors that must be found before the maximum penalty may be imposed and mitigating factors that militate against imposition of the maximum penalty despite the presence of aggravating factors.

> [T]he principal dissent ignores the distinction the Court has often recognized ... between facts in aggravation of punishment and facts in mitigation.... If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute. If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.

**22.** Of course, Appellant could not have waived his *Apprendi* rights in 1990 because *Apprendi* was not decided until ten years later.

**23.** Ark.Code Ann. § 5–4–618(d)(2)(A) (if pretrial determination by trial court is unfavorable to defendant, defendant can demand de novo determination by jury); Cal Penal Code § 1376(b)(2); Conn. Gen. St. § 53a–46a(h); Ga.Code Ann. § 17–7–131(c)(3); La.Code Crim. Proc. Art. 905.5.1(C)(1); Mo. Rev. St. § 565.030.4(1), (4); N.C. Gen. St. Ann. § 15A–2005(e) (if pretrial determination by court is unfavorable to defendant, defendant

*Apprendi,* 530 U.S. at 490 n. 16, 120 S.Ct. at 2363 n. 16. Appellant's jury found beyond a reasonable doubt that he committed two murders, thus authorizing imposition of the statutory maximum sentence of death. KRS 532.025(2)(a)(6). Like the hypothetical "war veteran" exemption discussed in *Apprendi,* the mental retardation exemption neither exposes the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor imposes upon the defendant a greater stigma than that accompanying the jury verdict alone. "Core concerns animating the jury and burden-of-proof requirements are thus absent from such a scheme." *Apprendi,* 530 U.S. at 490 n. 16, 120 S.Ct. at 2363 n. 16.

> The Supreme Court would unquestionably look askance at a suggestion that in Atkins it had acted as a super legislature imposing on all of the states with capital punishment the requirement that they prove as an aggravating circumstance that the defendant has normal intelligence and adaptive function.

*State v. Williams,* 831 So.2d 835, 860 n. 35 (La.2002).

While eight states currently provide a statutory right to a jury trial on this issue,[23] seventeen of the remaining eighteen states with statutory mental retardation exemptions currently assign to the trial judge the determination of whether a defendant is entitled to the exemption.[24]

can demand jury determination); Va.Code Ann. § 19.2–264.3:1.1(C).

**24.** Ariz.Rev.Stat. § 13–703.02(G); Colo.Rev. Stat. § 18–1.3–1102(3); Del.Code Ann. tit. 11 § 4209(d)(3)(c); Fla. Stat. Ann. § 921.137(4); Idaho Code § 19–2515A(2), (3); Ill. Comp. Stat. ch. 725 § 5/114–15(b); Ind.Code § 35–36–9–5; Kan. Stat. Ann. § 21–4623(b); Ky. Rev.Stat. 532.135; Neb.Rev.Stat. § 28–105.01(4); Nev. Rev. St. 174.098(6); N.M. Stat. Ann. § 31–20A–2.1(C); N.Y.Crim. Proc. Law § 400.27(12)(a); S.D. Codified Laws § 23A–27A–26.3; Tenn.Code Ann. § 39–13–

The Maryland statute [25] does not designate the factfinder for this issue, but Maryland's intermediate appellate court 'has construed a Maryland rule of court to require that the issue be decided by the sentencing jury. *Richardson v. State*, 89 Md.App. 259, 598 A.2d 1, 3–4 (1991) (construing Md. Rule 4–343(h)), *aff'd*, 332 Md. 94, 630 A.2d 238 (1993).

No court that has addressed the issue in the absence of an exemption statute or when faced with a statute permitting the trial judge to decide whether the defendant is mentally retarded has held that there is a *constitutional right* to a jury trial on this issue.[26] Oklahoma's courts have recognized a common law right ·in this respect. *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556, 568 (2002) (establish-

ing procedure for deciding issue either pretrial by judge or during sentencing phase of trial by jury without addressing constitutional right to trial by jury), *modified in part by Lane v. Bass*, 2004 OK CR 14, 87 P.3d 629, 633 n. 2 (Okla.Crim.App. 2004) (specifically declining to address whether *Ring* applies to the *Atkins* exemption, but holding as a matter of state law that a defendant's affirmative waiver of a jury determination of that issue is required). Oklahoma's legislature, unlike Kentucky's, has not enacted an exemption statute that specifically designates the trial judge as the factfinder.

■ In the alternative, Appellant suggests that the language of KRS 532.135(4) ("The pretrial determination of the trial court shall not preclude the defendant

203(c); Utah Code Ann. § 77–15a–104(11)(a); Wash. Rev.Code § 10.95.030(2).

**25.** Md.Code Ann., Crim. Law § 2–202(b).

**26.** *In re Johnson*, 334 F.3d 403, 405 (5th Cir.2003) ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense."); *Walton v. Johnson*, 269 F.Supp.2d 692, 698 n. 3 (W.D.Va.2003) (*Ring* and *Apprendi* do not require as a matter of constitutional law that the question of mental retardation be determined by a jury because the existence of mental retardation does not increase the penalty for the crime beyond the prescribed statutory maximum, thus is not the equivalent of an element of the offense; rather, a finding of mental retardation precludes the state from carrying out the death sentence, thus is analogous to the question of competency to be executed in death·penalty cases, which need not be decided by a jury.); *Head v. Hill*, 277 Ga. 255, 587 S.E.2d 613, 620 (2003) ("[T]he absence of mental retardation is not the functional equivalent of an element of an offense such that determining its absence or presence requires. a jury trial under *Ring*."); *State v. Williams*, 831 So.2d 835, 860 n. 35 (La.2002) (*Atkins* addressed mental retardation as an exemption from capital punishment, not as a fact the *absence* of which operates "as the functional equivalent of an element of a greater offense"); *Russell*

*v. State*, 849 So.2d 95, 148 (Miss.2003) ("[N]ot being mentally retarded is not an aggravating factor necessary for imposition of the death penalty, and *Ring* has no application to an *Atkins* determination."); *State v. Lott*, 97 Ohio St.3d 303, 779 N.E.2d 1011, 1015 (2002) (likening the issue to a trial court's determination of defendant's competency to stand trial); *State v. Flores*, 135 N.M. 759, 93 P.3d 1264, 1268 (2004) ("[T]he Sixth Amendment does not require the issue of a defendant's mental retardation in a capital prosecution to be proved to a jury beyond a reasonable doubt,") but also holding, *id.* at 1271, that a jury's finding of mental retardation as a mitigating circumstance would exempt the defendant from the death penalty; *Franklin v. Maynard*, 356 S.C. 276, 588 S.E.2d 604, 606 (2003) (holding that the trial judge shall make the mental retardation determination at a pretrial hearing but also holding that if the jury finds mental retardation as a mitigating circumstance, the death penalty will not be imposed); *Howell v. State*, 151 S.W.3d at 464–65 (Tenn.2004) (absence of mental retardation not an element of the offense and not required to be proven by the State nor found by a jury); *Ex Parte Briseno*, 135 S.W.3d 1, 10 (Tex.Crim.App.2004) (lack of mental retardation is not an implied element of capital murder).

from raising any legal defense during the trial.") affords a death-eligible defendant the right to present the issue to a jury in the event of an adverse determination by the trial judge. We disagree. If the General Assembly had intended to afford a defendant two bites of this issue, it would have said, *e.g.*, "shall not preclude the defendant from *relitigating this issue* during the trial." *Compare* Ark.Code Ann. § 5-4-618(d)(2)(A) ("If the court determines that the defendant is not mentally retarded, the defendant may raise the question of mental retardation to the jury for determination de novo during the sentencing phase of the trial."); N.C. Gen. St. Ann. § 15A-2005(e) ("If the court does not find the defendant to be mentally retarded in the pretrial proceeding, upon the introduction of evidence of the defendant's mental retardation during the sentencing hearing, the court shall submit a special issue to the jury as to whether the defendant is mentally retarded as defined in this section.... If the jury determines the defendant to be mentally retarded, the court shall declare the case noncapital and the defendant shall be sentenced to life imprisonment.").

In the absence of some specific language indicating an intent to have the mental retardation exemption issue decided by both judge and jury, we conclude that the language in KRS 532.135(4) refers to other statutory defenses presented at trial in defense, exculpation or mitigation of criminal conduct, *e.g.*, the mental illness or retardation defense described in KRS 504.020, the subjective elements of the KRS Chapter 503 defenses and of extreme emotional disturbance under KRS 507.020(1)(a), *cf. Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky.2001)

(presence of mental illness is relevant to subjective evaluation of reasonableness of defendant's response to provocation), and the mitigating circumstance described in KRS 532.025(2)(7).

We conclude that an otherwise death-eligible defendant is not entitled to have a jury decide the mental retardation exemption claim.

## IX. BURDEN AND STANDARD OF PROOF.

 It is not unconstitutional to assign to a criminal defendant the burden to prove a fact that would mitigate the crime. *Martin v. Ohio*, 480 U.S. 228, 235–36, 107 S.Ct. 1098, 1103, 94 L.Ed.2d 267 (1987) (self-defense); *Patterson v. New York*, 432 U.S. 197, 206–07, 97 S.Ct. 2319, 2325, 53 L.Ed.2d 281 (1977) (extreme emotional disturbance); *Leland v. Oregon*, 343 U.S. 790, 798–99, 72 S.Ct. 1002, 1007, 96 L.Ed. 1302 (1952) (insanity). Thus, a defendant may be constitutionally required to prove mitigating circumstances to avoid a death sentence or "to bear the risk of non-persuasion as to the existence of mitigating circumstances." *Delo v. Lashley*, 507 U.S. 272, 275, 113 S.Ct. 1222, 1224, 122 L.Ed.2d 620 (1993) (internal citation and quotation omitted); *cf. Medina v. California*, 505 U.S. 437, 450–51, 112 S.Ct. 2572, 2580, 120 L.Ed.2d 353 (1992) (state can assign to defendant the burden of proving by a preponderance of the evidence that he is mentally incompetent to stand trial). Every state statute providing a mental retardation exemption from the death penalty places the burden on the defendant to prove that he is mentally retarded,[27] as has every court that has addressed the

27. *See* statutes cited in notes 32–34, *infra*, and Conn. Gen.Stat. § 53a–46a(c),(d),(h); Kan.

Stat. Ann. § 21–4623(d); KRS 532.135(1).

issue,[28] usually in the context of holding that the absence of mental retardation is not an element of the offense.[29] The primary issue about which legislatures disagree is the standard of proof applicable to the defendant's burden. Neither *Atkins* nor KRS 532.135 addresses this issue.

Like KRS 532.135, the statutes of Connecticut[30] and Kansas[31] do not address the standard of proof applicable to this issue. Six state statutes require the defendant to prove mental retardation by clear and convincing evidence[32] and one requires proof beyond a reasonable doubt.[33] The remaining sixteen statutes that address the issue require proof by a preponderance of the evidence.[34] The United States Supreme Court has not addressed this issue in the context of the *Atkins* exemption. However, in *Cooper v. Oklahoma,* 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996), the Court held unconstitutional a statute requiring a defendant to prove incompetency to stand trial by a standard higher than a preponderance of the evidence. *Id.* at 355, 116 S.Ct. at 1377. All courts that have considered the issue in the absence of a statute have held that the defendant is required to prove entitlement to the *Atkins* exemption by a preponderance of the evidence.[35]

We have applied the "preponderance of the evidence" standard to a defendant's burden to prove incompetency to stand trial, *Jacobs v. Commonwealth,* 58 S.W.3d 435, 440 (Ky.2001), and to affirmative defenses. *Blair v. Commonwealth,* 144 S.W.3d 801, 810 (Ky.2004). We now apply that standard to the defendant's burden to prove at an evidentiary hearing that he or she is entitled to the mental retardation exemption described in KRS 532.130, *et. seq.*

## X. PRIMA FACIE SHOWING.

▆▆▆ Not every defendant who claims to be mentally retarded is entitled to a hearing on the issue.

28. *See, e.g.,* cases cited in note 26, *supra,* and Nava Feldman, Annotation, *Application of Constitutional Rule of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that Execution of Mentally Retarded Persons Constitutes "Cruel and Unusual Punishment" in Violation of Eight Amendment,* 122 A.L.R.5th 145 §§ 13, 14, 15 (2004).

29. *E.g., Russell v. State,* 849 So.2d 95, 148 (Miss.2003); *Ex Parte Briseno,* 135 S.W.3d 1, 12 (Tex.Crim.App.2004); *Winston v. Commonwealth,* 268 Va. 564, 604 S.E.2d 21, 50 (2004).

30. Conn. Gen.Stat. § 53a–46a(c),(d),(h).

31. Kan. Stat. Ann. § 21–4623(d).

32. Ariz.Rev.Stat. § 13–703.02(G); Colo Rev. Stat. § 18–1.3–1102(2); Del Code Ann. tit. 11 § 4209(d)(3)(b); Fla. Stat. Ann. § 921.137(4); Ind.Code Ann. § 35–36–9–4(b); N.C. Gen. Stat. § 15A–2005(c).

33. Ga.Code Ann. § 17–7–131(c)(3).

34. Ark.Code Ann. § 5–4–618(c); Cal Penal Code § 1376(b)(3); Idaho Code § 19–2515A(3); Ill. Comp. Stat. ch. 725 § 5/114–15(b);. La.Code Crim. Proc. Art. 905.5.1(C)(1); Md.Code Ann., Crim. Law § 2–202(b)(2)(ii); Mo. Rev. St. § 565.030.4(1); Neb.Rev.Stat. § 28–105.01(4); Nev. Rev. St. 174.098(5)(b); N.M. Stat. Ann. § 31–20A–2.1(C); N.Y.Crim. Proc. Law § 400.27(12)(a); S.D. Codified Laws § 23A–27A–26.3; Tenn.Code Ann. § 39–13–203(c); Utah Code Ann. § 77–15a–104(11)(a); Va.Code Ann. § 19.2–264.3:1.1(C); Wash. Rev.Code § 10.95.030(2).

35. *E.g., State v. Williams,* 831 So.2d 835, 860 (La.2002); *Russell v. State,* 849 So.2d 95, 148 (Miss.2003); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1015 (2002); *Murphy v. State,* 54 P.3d 556, 568 (Okla.Crim.App.2002); *Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 211 n. 8 (2003); *Franklin v. Maynard,* 356 S.C. 276, 588 S.E.2d 604, 606 (2003); *Ex Parte Briseno,* 135 S.W.3d 1, 12 (Tex.Crim.App.2004).

[T]he granting of an evidentiary hearing on the issue of mental retardation is not a perfunctory matter or a ministerial duty of the trial court, and *is not guaranteed to every [defendant] in every [capital] case.* There is no automatic right to a hearing on the issue of mental retardation, whether the hearing is sought pre-trial, while the case is on appeal, or as post-conviction relief.

*State v. Williams,* 831 So.2d 835, 858 n. 33 (La.2002) (internal citation and quotation omitted). To be entitled to a hearing, there must be at least a prima facie showing that the defendant may, in fact, be mentally retarded.

Were it otherwise, then literally any prisoner under a death sentence could bring an *Atkins* claim in a second or successive petition regardless of his or her intelligence. No rational argument can possibly be made that this result is appropriate ....

*In re Holladay,* 331 F.3d 1169, 1173 n. 1 (11th Cir.2003).

To determine what sufficed to make a prima facie showing, the Supreme Court of Louisiana in *Williams* borrowed from the standard set forth in its criminal code provision pertaining to a defendant's entitlement to a competency evaluation. La. Stat. Ann.Code Crim. Proc. Art. 643 ("The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed."). 831 So.2d at 868 n. 33. The provision "establishes a standard that a defendant must meet by coming forward with some evidence to put his mental condition at issue." *Id.* Similarly, KRS 504.100(1) provides that a mental examination and evidentiary hearing is required "[i]f ... the court has reasonable grounds to believe the defendant is incompetent to stand trial...." In the context of whether a defendant is entitled to file a successive petition for a writ of habeas corpus to assert an *Atkins* claim, federal courts have applied the definition of "prima facie showing" often used in deciding whether to grant a successive petition raising other issues, *i.e.,* "a sufficient showing of possible merit to warrant a fuller exploration." *In re Holladay,* 331 F.3d 1169, 1173 (11th Cir.2003); *In re Morris,* 328 F.3d 739, 740 (5th Cir.2003); *cf. Bennett v. United States,* 119 F.3d 468, 469 (7th Cir.1997) (applying same test to belated claim of insanity). The statutes of New York and South Dakota require a showing that there is "reasonable cause to believe that the defendant [is][was] mentally retarded." N.Y.Crim. Proc. Law § 400.27(12)(a); S.D. Codified Laws § 23A.27A–26.1. The Kansas statute requires a showing that "there is sufficient reason to believe that the defendant is mentally retarded." Kan. Stat. Ann. § 21–4623(a). The Virginia statute requires a hearing unless the claim is deemed "frivolous." Va.Code Ann. § 8.01–654.2.

In *Johnson v. State,* 102 S.W.3d 535 (Mo.2003), the defendant was held entitled to an evidentiary hearing because "reasonable minds could differ as to [his] mental abilities." *Id.* at 540. *Compare State v. Dann,* 206 Ariz. 371, 79 P.3d 58, 63 (2003) (Defendant "has offered no evidence that raises any doubt as to whether he may be mentally retarded."); *Branch v. State,* 882 So.2d 36, 51 (Miss.2004) (defendant with a WAIS–III–assessed IQ of 84 at age twenty-two failed to make a prima facie showing that he was mentally retarded even though Stanford–Binet assessment at age five had shown an IQ of 68); *Johnson v. Commonwealth,* 267 Va. 53, 591 S.E.2d 47, 58–59 (2004) (defendant's claim deemed "frivolous" under Va.Code Ann. § 8.01–654.2 where his IQ scores were 75 and 78 and statute required an IQ of "two or

more deviations below the mean," *i.e.*, 70 or below).

■ Though articulated differently, these tests are essentially the same. We hold that to be entitled to an evidentiary hearing on a claim of entitlement to the mental retardation exemption provided by KRS 532.140(1), a defendant must produce some evidence creating a doubt as to whether he is mentally retarded.

■ As noted earlier, two IQ tests were administered to Appellant within a month of his December 1990 trial. The WAIS–R test administered by the court-appointed psychologist measured Appellant's IQ at 86. The Shipley–Hartford Intelligence Scale test administered by the psychologist selected by Appellant's attorneys measured Appellant's IQ at 87. In his brief[36] and at oral argument, Appellant claimed that an IQ test administered when he was in junior high school had measured his IQ at 74, within the five-point margin of error that he claims should be applied to the definition in KRS 532.130(2) of "significantly subaverage general intellectual functioning." However, the only pre–1990 IQ test scores found in this record are those found in Appellant's seventh grade record (Exhibit 5 to petition filed in the Fayette Circuit Court), which reflects that Appellant was twice administered the Otis Mental Ability Test. The first test, administered on November 28, 1966, measured his IQ at 84;[37] the second test, administered on March 31, 1967, measured his IQ at 79. We find no evidence in this record of a test measuring Appellant's IQ at 74.

Appellant's IQ scores show that he could not meet the "significantly subaverage intellectual functioning" criterion of the statutory definition of "mental retardation" even if the General Assembly had provided for application of a five-point margin of error and a three-point "Flynn effect." Thus, we need not address whether he meets the "substantial deficits in adaptive behavior" criterion of the definition. *Johnson v. Commonwealth*, 267 Va. 53, 591 S.E.2d 47, 59 (2004) (where statutory threshold was IQ of 70 and defendant's IQ test scores were 75 and 78, the record "shows as a matter of law that [he] is unable to meet the definition of "mentally retarded")." Thus, even if Appellant had not procedurally defaulted this claim, he has produced no evidence that creates a doubt as to whether he is mentally retarded. Denial of an opportunity to further litigate this claim will not result in a fundamental miscarriage of justice, *Coleman v. Thompson*, 501 U.S. at 750, 111 S.Ct. 2546, because it will not result in the imposition of the death penalty where a "condition of eligibility ha[s] not been met." *Sawyer v. Whitley*, 505 U.S. at 345, 112 S.Ct. at 2522.

Accordingly, the order of dismissal entered by the Fayette Circuit Court is affirmed.

LAMBERT, C.J.; JOHNSTONE, SCOTT, and WINTERSHEIMER, JJ., concur.

KELLER, J., dissents by separate opinion, with GRAVES, J., joining that dissenting opinion.

---

**36.** Appellant's brief, at 16, 41, 43.

**37.** Even if the dissenting opinion's supposition (with which we strongly disagree) were true that the person who recorded the score of 84 attempted to superimpose a "7" over an "8," the relevancy of an IQ score of 74 at age thirteen would be clearly outweighed by Appellant's IQ scores of 79 measured five months later, and 86 and 87 measured twenty-four years later and in the same time frame as the offenses and the trial. If a trial court found otherwise, we would deem that finding to be clearly erroneous. CR 52.01.

KELLER, Justice, dissenting.

Although I agree with most of the majority opinion, I do not believe that a defendant can waive a claim of mental retardation because the State is constitutionally prohibited from executing mentally retarded individuals. I also do not believe that trial courts are limited to a bright-line rule of an intelligence quotient (IQ) test score at or below 70 when determining whether an individual is mentally retarded, nor do I believe that Appellant's evidence was insufficient to warrant a hearing. Thus, I write separately.

In *Atkins v. Virginia,*[1] the U.S. Supreme Court exempted *all* condemned mentally retarded offenders from the death penalty by holding that the execution of mentally retarded offenders constitutes cruel and unusual punishment, which is prohibited by the Eighth Amendment. The majority opinion, however, claims that because Kentucky provides a statutory mechanism for raising the issue of mental retardation before trial, and Appellant failed to utilize that mechanism even though it had been in effect all of five months before his trial, Appellant has waived any Eighth Amendment mental retardation claim. This clearly conflicts with the holding in *Atkins* that the "Constitution 'places a *substantive restriction* on the State's power to take the life' of a mentally retarded offender."[2] *Atkins* cited Kentucky's statutory scheme, not necessarily with approval, but as evidence of the emerging national consensus against the

execution of the mentally retarded. By then holding that the Eighth Amendment contained a "substantive restriction" against such executions, the Supreme Court raised the bar of protection above that which had been provided in the various mental retardation statutes in existence at the time. This is, in fact, part of the argument that Justice Scalia raised in his dissent in *Atkins*, i.e., that the majority's opinion went (1) further than any actually-existing national consensus (given that only 47% of death penalty States at the time had statutes that made mental retardation a bar to execution versus a mitigating factor) and (2) further than the "consensus" that existed even among that 47% of death penalty States.[3] Yet we are bound by the majority opinion, which, in effect, recognized that the emerging national consensus against allowing the execution of mentally retarded defendants meant that the Eighth Amendment contained a categorical bar against the execution of the mentally retarded. In other words, what had formerly been only a statutory procedural right in some States, including Kentucky, before *Atkins* has now been raised to the level of a substantive constitutional prohibition applicable to all fifty States.

Thus, the mere fact that Kentucky's statutes provided (and still provide) a pretrial means to challenge the applicability of the death penalty when the defendant may be mentally retarded is not enough to protect the interest recognized in *Atkins*. As the Supreme Court noted in a similar case

---

1. *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 2252, 153 L.Ed.2d 335 (2002).

2. *Atkins,* 536 U.S. at 321, 122 S.Ct. at 2252 (citing *Ford v. Wainwright,* 477 U.S. 399, 405, 106 S.Ct. 2595, 2599, 91 L.Ed.2d 335 (1986)) (emphasis added); *see also Gilmore v. Utah,* 429 U.S. 1012, 1019, 97 S.Ct. 436, 440, 50 L.Ed.2d 632 (1976) (Marshall, J., dissenting) ("I believe that the Eighth Amendment not

only protects the right of individuals not to be victims of cruel and unusual punishment, but that it also expresses a fundamental interest of society in ensuring that state authority is not used to administer barbaric punishments.").

3. *Atkins,* 536 U.S. at 341–48, 122 S.Ct. at 2262–65 (Scalia, J., dissenting).

involving the execution of an insane person, "Once a substantive right or restriction is recognized in the Constitution, ... its enforcement is in no way confined to the rudimentary process deemed adequate in ages past." [4] And as the concurring fifth vote in that case noted, "the Eighth Amendment claim at issue can arise only *after* the prisoner has been validly convicted of a capital crime and sentenced to death." [5] Furthermore, "[s]ociety's independent stake in enforcement of the Eighth Amendment's prohibition against cruel and unusual punishment cannot be overridden by a defendant's purported waiver." [6]

This makes sense in light of the majority of Eighth Amendment jurisprudence. For example, the Supreme Court has decided that the Eighth Amendment prohibits the State from taking the life of an offender fifteen years of age or less,[7] and Kentucky has statutorily enacted this constitutional proscription.[8] And more recently, the Supreme Court ruled that the Eighth Amendment also prohibits the imposition of the death penalty for sixteen and seventeen year olds.[9] If the issue of an offender's age had not been presented or addressed previously by the trial court, no one, at least hopefully no one, would seriously argue that the issue was waived and could not be presented later if evidence, or a reasonable inference from the evidence, became available that showed that the offender was less than sixteen at the time of the offense.

Ultimately, while pretrial measures are laudable, they alone are not sufficient to protect the substantive right implicit in the Eighth Amendment and recognized in *Atkins.* Because there is, at least, some indicia of mental retardation, no hearing has been held on this matter, and a constitutional claim of such magnitude is involved, it is also unthinkable that we would assume a waiver and thus violate the precept that "[w]e cannot presume a waiver ... from a silent record." [10] Furthermore, to say that such a claim is waivable *by default* not only runs afoul of the Eighth Amendment but also conflicts with KRS 532.075, which provides that all death penalties are reviewable by this Court. Thus, despite Appellant's failure to avail himself of the pretrial procedures described in KRS 532.130–.140, and because the State may not execute him if he is mentally retarded, we cannot deprive him of the opportunity to be heard now on his mental retardation claim.[11]

---

4. *Ford v. Wainwright,* 477 U.S. 399, 410, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (plurality opinion).

5. *Id.* at 425, 106 S.Ct. at 2609–10 (Powell, J., concurring) (emphasis added).

6. *Lenhard v. Wolff,* 444 U.S. 807, 811, 100 S.Ct. 29, 30–31, 62 L.Ed.2d 20 (1979) (Marshall, J., dissenting); *see also Gilmore,* 429 U.S. at 1018, 97 S.Ct. at 439–40 (White, J., dissenting) ("I believe, however, that the consent of a convicted defendant in a criminal case does not privilege a State to impose a punishment otherwise forbidden by the Eighth Amendment.").

7. *Thompson v. Oklahoma,* 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988).

8. KRS 640.040(1).

9. *Roper v. Simmons,* —— U.S. ——, 125 S.Ct. 1183, 161 L.Ed.2d 1, 2005 WL 464890 (2005).

10. *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).

11. *See also United States v. Cota–Corrales,* No. 00–10184, 243 F.3d 550 (Table), 2000 WL 1808108 at *1 (9th Cir.2000) (unpublished opinion) ("Thus, we have addressed the merits of an Eighth Amendment claim notwithstanding an appeal waiver. *See United States v. Aguilar–Muniz,* 156 F.3d 974, 978 (9th Cir. 1998)."); *In re Grand Jury Proceedings,* 33 F.3d 1060, 1062 (9th Cir.1994) ("The time to raise the issue of an Eighth Amendment violation of his right to be free from excessive fines is after the imposition of such a fine.").

Though the majority claims that Appellant waived his Eighth Amendment claim, it appears to back away from this harsh default rule by citing to *Coleman v. Thompson*, which held that review of procedurally defaulted constitutional claims can be reviewed where "the prisoner can ... demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." [12] The majority opinion then admits that if Appellant could prove that he is mentally retarded, he would, in effect, show "actual innocence," to wit, "that some other condition of eligibility had not been met," [13] at least with regard to the availability of the death penalty. But the majority opinion avoids this issue by finding that Appellant has not made a prima facie showing sufficient to create doubt as to whether he is mentally retarded.

While I agree that Appellant must at least make a prima facie showing that he is mentally retarded before he is entitled to a hearing, I disagree with the majority's finding that he has not made a prima facie showing because the evidence presented to the trial court, although slight, was sufficient to create a doubt as to his mental condition. There was some evidence of substantial deficits in adaptive behavior and of subaverage mental functioning (i.e., an IQ of less than 70). Appellant has also produced some evidence that both circumstances manifested during the developmental period, i.e., before he became an adult.

The majority opinion focuses on Appellant's IQ, stating that there is no evidence in the record of an IQ test score of 74 (as claimed by Appellant) because the score in question is an 84. The following is a scanned reproduction of the section of Appellant's school records, as included in the Appellate record, listing the IQ test score in question:

| MENTAL ABILITY | | | | | | |
|---|---|---|---|---|---|---|
| DATE | GRADE | TEST | C. A. | M. A. | I. Q. | EXAMINER |
| 9/-29 | 7 | Otis Mental Ability | | | 84 | T. Begley |

On further examination, this test score is handwritten and appears to include a "7" superimposed over an "8." The majority opinion does not even acknowledge this obvious ambiguity, choosing instead to make the factual finding that the IQ score in question is an 84, i.e., an implicit finding that the questionable number in the image above is an "8" rather than a "7." But this factual ambiguity is not for us, as an appellate court, to decide. Such factual findings are reserved for the trial court. That one handwritten number appears to be superimposed over the other presented the trial court with a credible question of fact as to whether Appellant had received a score of 74 on the IQ test in question, but the trial court did not make the requisite finding, one way or the other. The trial court should now be tasked with resolving this ambiguity.

This then raises my final point of disagreement with the majority: If the IQ test score in question is a 74, then Appellant's actual IQ could have fallen into the below–70 region contemplated by both *Atkins* and Kentucky's statutes. The majority finds that the General Assembly's use of an IQ of 70 as part of the definition of mental retardation creates a bright-line test that does not admit the possibility of applying a margin of error. First, this presupposes that our statutory scheme,

**12.** *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2565 (1991).

**13.** *Sawyer v. Whitley*, 505 U.S. 333, 345, 112 S.Ct. 2514, 2522, 120 L.Ed.2d 269 (1992).

which allows only for a pretrial challenge, is the only means of pursuing an Eighth Amendment mental retardation claim. As discussed above, I disagree with this supposition. Because the General Assembly has not supplied a procedure for challenging a death-penalty sentence on the basis of mental retardation after trial, it has failed to provide a sufficient statutory framework, even though *Atkins* indicates that the States may supply their own definitions of "mental retardation."

But even assuming that the current statutory definition is applicable to post-trial proceedings, it is not clear that the General Assembly intended an IQ *test score* of 70 or below to be a bright-line cutoff. Notice that the General Assembly did not mention the results of an IQ test score in defining mental retardation; instead, it stated that "significantly subaverage general intellectual functioning," one of the requirements for a finding of mental retardation, "is defined as an intelligence quotient (I.Q.) of seventy (70) or below." [14] A *score* on an IQ test, however, is merely evidence of a person's actual IQ. To claim that the judge is bound to a mechanical process of determining whether a given IQ *test score* is 70 or below reduces the judge to a mere administrator comparing numbers on a roll. But the judge is charged with judging, that is, with making decisions and, where necessary, finding facts. To do this, the judge must consider evidence. That evidence might come in the form of an IQ test score, but it might also come in the form of expert testimony as to the margin of error of a given testing procedure or as to the so-called "Flynn effect." Kentucky's statutory scheme includes no limitations on the types of evidence that a judge can consider in making a mental retardation determination, nor should it.

The record in this case includes evidence of a possible five-point margin of error in the testing procedures used to test Appellant's IQ and evidence of a possible three-point error from the Flynn effect. When these errors are combined with the ambiguity discussed above, it is possible that Appellant's IQ is well below 70. And though IQ is only one of several factors in determining whether a given defendant is mentally retarded, this evidence, when combined with the other evidence in the record of Appellant's alleged "deficits in adaptive behavior," creates sufficient doubt to warrant a hearing.

Furthermore, it is obvious that the trial judge denied Appellant's motion for a hearing solely because, as she opined, she thought mental retardation was only a matter of mitigation, which is clearly contrary to the holding in *Atkins* and the purpose of KRS 532.130–.140. Thus, the trial judge never determined whether the IQ test score on which Appellant relies was a "74," as it appears to me, or an "84," as implicitly found by the majority. In fact, she did not even determine whether the evidence overall was sufficient to warrant an evidentiary hearing. The majority opinion, however, has inappropriately made a finding in this regard. For this reason alone, the case should be remanded to the trial court. Accordingly, I would remand the case to the trial court for its proper consideration of Appellant's motion.

GRAVES, J., joins this dissenting opinion.

14. KRS 532.130(2).